674 F.2d 1252
 CLIPPER EXXPRESS, a corporation, Plaintiff-Appellant,
v.
ROCKY MOUNTAIN MOTOR TARIFF BUREAU, INC., Yellow Freight
Systems, Inc., Consolidated Freightways Corporation of
Delaware, Illinois-California Express Inc., IML Freight
Inc., Pacific Intermountain Express Co., T.I.M.E.--D.C.
Inc., Consolidated Copperstate Lines, Garrett Freight Lines,
Inc., Navajo Freight Lines, Inc., N.W. Transport Service,
Inc., Ringsby Truck Lines, Inc., Rio Grande Motor Way, Salt
Creek Freight Ways, Transcon Lines, United Buckingham
Freight Lines and Western Gillette, Inc., Defendants-Appellees.
 No. 78-3684.
 United States Court of Appeals, Ninth Circuit.
 Argued Oct. 14, 1980.
Submitted Oct. 24, 1980.
Decided April 19, 1982.
As Amended July 29, 1982.
 
 Appeal from the United States District Court for the Northern District of California.
 Eugene C. Crew, Joel Linzner, San Francisco, Cal., argued, for plaintiff-appellant; Mark J. Le Hocky, Broad, Khourie & Schulz, San Francisco, Cal., on brief.
 J. Thomas Rosch, San Francisco, Cal., argued, for defendants-appellees; Ann Fingarette Hasse, McCutchen, Doyle Brown & Enersen, San Francisco, Cal., on brief.
 Robert S. Griswold, Jr., Gary Roberts, San Francisco, Cal., on brief, for I.C.C. amicus curiae.
 Before WALLACE and ALARCON, Circuit Judges and von der HEYDT,* District Judge.
 ALARCON, Circuit Judge:
 
 
 1
 Plaintiff Clipper Exxpress (Clipper) appeals from the entry of an order granting summary judgment for the defendant trucking companies and Rocky Mountain Motor Tariff Bureau (RMMTB) [hereinafter jointly referred to as defendants]. Clipper sued defendants for various antitrust violations arising from protests filed with the Interstate Commerce Commission (ICC) by defendants with regard to certain shipping rates published[1] by Clipper. The district court granted summary judgment for defendants based on (1) the Noerr-Pennington[2] exception to the antitrust laws, which the district court held cloaked the defendants' actions with immunity, and (2) the Keogh[3] doctrine, which the district court held barred the recovery of damages in this antitrust action. We reverse and remand for a trial on the merits because neither the Noerr-Pennington exception nor the Keogh doctrine provide defenses as a matter of law under these facts.
 
 FACTS
 
 2
 Clipper is an ICC-regulated freight forwarder, subject to regulation under the Interstate Commerce Act (ICA). As a freight forwarder, Clipper itself ships no goods, but rather assembles and consolidates small shipments into single lots for shipment by carrier companies.
 
 
 3
 Defendants are ICC-regulated trucking companies and the RMMTB. RMMTB is a rate bureau formed under the ICA. A rate bureau is an organization formed by an agreement among common carriers. Through the bureau the carriers act collectively to initiate, consider and establish rates and fares for members of the bureau. When acting in conformity with an ICC-approved agreement, joint rate setting action is not subject to the antitrust laws. 49 U.S.C. Sec. 10706. RMMTB's membership consists of approximately 1,400 motor carriers, and represents approximately 80 percent of the transcontinental surface transportation market.
 
 
 4
 ICC rate regulation of freight forwarders such as Clipper is provided in 49 U.S.C. Sec. 1005, recodified as 49 U.S.C. Secs. 10725, 10762. Under Sec. 1005, a freight forwarder seeking a rate change publishes a new rate. In the absence of a protest, the rate will take effect automatically thirty days later. If there is a protest, the ICC can suspend effectiveness of the rate while investigating the protest. The ICC also retains power to suspend any new rate sua sponte, but this power is rarely exercised.
 
 
 5
 In the late 1960's, freight forwarding was a failing industry. The freight forwarding industry suffered heavy traffic losses because of the competition presented from 'shipper associations' and 'shipper agents' whose rates were unregulated. An ICC investigation revealed that the freight forwarder's economic predicament was due to the lower rates of these unregulated associations. The ICC recommended that the freight forwarders lower their rates to compete effectively with the lower rates of unregulated associations.
 
 
 6
 In November 1970, Clipper, in order to compete with the rates of the unregulated associations, published Tariff 55, a lowered rate of $1056 per 30,000 pound shipment. Clipper hoped to eventually lower its rate to $842 per 30,000 pounds. Clipper fully expected defendants to protest to the ICC any lowered rate it published.[4] Clipper hoped that by publishing the intermediate $1,056 rate instead of the lower $842 rate, the ICC would not act on defendants' anticipated protest by investigating and suspending implementation of Clipper's new rate. Clipper intended to lower its rate to 842 if the ICC did not investigate and suspend the intermediate rate.
 
 
 7
 As expected, a few days after the $1,056 Tariff 55 was published, RMMTB filed a protest to Tariff 55 with the ICC. The ICC did not suspend the $1,056 rate, but did investigate the rate over the next two years. During the course of the ICC investigation, Clipper filed several amendments to Tariff 55--which both extended the geographical coverage of the rate and progressively lowered the rate. RMMTB protested each amendment. The ICC found for Clipper throughout its investigation. The defendants exhausted all the ICC procedures in order to prevent implementation of Tariff 55, and received no relief. At the conclusion of this administrative process, Clipper lowered Tariff 55 to the $842 level; defendants' protest to this rate was also unsuccessful.
 
 THE PROCEEDINGS BELOW
 
 8
 In 1972 Clipper filed a complaint in district court against RMMTB and various trucking companies, alleging antitrust violations. In addition, to avoid the general principle that genuine efforts to induce legislative or administrative action, even if undertaken for the purpose of stifling competition, are outside the scope of the antitrust laws, Clipper relied on three theories in its pleadings. First, Clipper contended that defendants' protests of Tariff 55 were sham protests filed 'for the purpose of directly restricting, lessening, and prohibiting the legitimate competition' of freight forwarders. Second, Clipper contended[5] that defendants attempted to influence ICC action by supplying fraudulent information to the ICC. Clipper relied on the Walker Process[6] doctrine, which extends antitrust liability to one who commits fraud on a court or agency to obtain competitive advantage. Finally, Clipper contended that the protests were simply part of a larger independent antitrust violation.[7]
 
 
 9
 Clipper claimed it sustained thirty million dollars of damages because of the actions of defendants and sought treble that amount. These damages allegedly represented (1) the loss incurred by Clipper in having to delay over two years before instituting its final $842 rate; (2) the costs in having to respond to the protests; and (3) business loss because of the instability and uncertainty surrounding Clipper's rates, due to the ICC investigation. Clipper claims that shippers will not use a rate if it is under ICC investigation.
 
 
 10
 Proceedings were stayed by the district court judge to permit the ICC to rule on defendants' protests. After the ICC overruled all the protests, court proceedings were revived.
 
 
 11
 After denying two previous motions by the defendants for a summary judgment, defendants' third summary judgment motion was granted on July 27, 1978, and entered on July 31, 1978. The district court held that the protests to the ICC were immune as a matter of law, relying on Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers, 542 F.2d 1076 (9th Cir. 1976), cert. denied, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977). Moreover, the district court held that Clipper was attempting to collect damages which rest on assumptions as to ICC actions, and held this was prohibited as a matter of law by Keogh v. Chicago & N. W. Railroad Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922).
 
 JURISDICTION
 
 12
 The defendant-appellees contend that this court is without jurisdiction over this appeal because Clipper did not file its Notice of Appeal within the requirements of Rule 4(a) of the Federal Rules of Appellate Procedure.
 
 
 13
 Timely filing of a Notice of Appeal is a prerequisite to this court's appellate jurisdiction. See Browder v. Director, Department of Corrections, 434 U.S. 257, 264, 98 S.Ct. 556, 560, 54 L.Ed.2d 521 (1978). We find that this Notice of Appeal was timely filed and we therefore hold that this court has jurisdiction over this appeal.[8]
 
 
 14
 Rule 4(a) of the Federal Rules of Appellate Procedure provides that a Notice of Appeal is to be filed within thirty days of entry of judgment. The thirty-day period, however, is tolled by the timely service of a Rule 59(e) motion to reconsider and vacate the judgment. If a 59(e) motion is timely served, the time for filing a Notice of Appeal is tolled and does not begin running until the district court disposes of the 59(e) motion. See Fed.R.App.P. 4(a)(4).[9]
 
 
 15
 Summary judgment for defendants was entered on July 31, 1978. Ten days later, on August 10, 1978, Clipper served a notice of motion and a motion to reconsider and vacate the order pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, supported by a memorandum of points and authorities. Clipper filed this motion in the district court on August 14, 1978. The motion was argued on September 11, 1978 and denied on October 13, 1978. Twenty-four days after the denial, on November 6, 1978, Clipper filed its Notice of Appeal.
 
 
 16
 Defendants contend that Clipper's 59(e) motion was not sufficient to toll the time for appeal on two grounds. First, defendants contend that the material served by Clipper on August 10 was incomplete, and therefore could not toll the time for filing a Notice of Appeal. Specifically defendants contend that because the motion itself stated that it was based on affidavits, and affidavits were not served with the motion, the motion was not a valid, complete 59(e) motion. Second, defendants contend that Clipper's 59(e) motion simply rehashes the arguments made in the summary judgment motion, and therefore does not constitute a valid 59(e) motion. We find no merit in either of these arguments.
 
 A. Complete Motion
 
 17
 The defendants' contention that Clipper's 59(e) motion was incomplete because the supporting affidavits were not filed within the time for service is spurious. The 59(e) motion was complete, valid, and sufficient to toll the running of time to file the Notice of Appeal without the affidavits. Rule 59(e) itself does not require supporting affidavits. The only indication in the Federal Rules of Civil Procedure as to what is necessary to constitute a valid motion is found in Rule 7(b)(1). Rule 7(b)(1) states that a motion 'shall be made in writing, shall state with particularity the grounds therefor, and shall set forth the relief or order sought.'[10]
 
 
 18
 Clipper's 59(e) motion as originally served set out the grounds on which the motion was based with particularity. Along with the motion, Clipper filed a 65-page document of supporting points and authorities, which raised substantive legal questions about the summary judgment motion without the need for the additional factual support that the affidavits would provide. This was more than sufficient to satisfy the particularity requirement of Rule 7(b). Defendants cite Daily Mirror, Inc. v. New York News, Inc., 533 F.2d 53 (2nd Cir.), cert. denied, 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 140 (1976), and Martinez v. Trainor, 556 F.2d 818 (7th Cir. 1977), in support of their contention that Clipper's motion was incomplete. Neither of these cases suggest that the motion filed by Clipper was insufficient and invalid as a 59(e) motion.
 
 
 19
 Daily Mirror is clearly distinguishable from the instant case. In Daily Mirror the plaintiffs filed a motion to vacate under Rule 60(b) of the Federal Rules of Civil Procedure after the trial judge granted summary judgment for defendants. 60(b) motions, even if valid, do not toll the time for filing notice of appeal. In footnote, the Daily Mirror court noted that while under some circumstances a court has discretion to treat a 60(b) motion as a 59(e) motion, such treatment would be inappropriate in this case. The court noted after deciding not to consider the rule 60 motion as a rule 59 motion, that the papers which were filed within the proper filing period were not a complete motion because they did not deal with the merits of the motion. It was only the late filed affidavits that dealt with the merits of the challenged summary judgment. 533 F.2d at 56 n.4. Defendants' reliance on Martinez v. Trainor is similarly unpersuasive. The motion filed in Martinez was insufficient as a complete motion. It noted, in less than a page, that the defendants requested the court pursuant to 59(e) to 'alter, amend, or vacate' the earlier judgment. 556 F.2d at 819. The motion did not set forth the grounds for the motion with any particularity. It was, as noted by the Seventh Circuit, simply a skeleton, which required later supplementation to satisfy the particularity requirements of 7(b)(1). This is in marked contrast to Clipper's motion which, as noted above, satisfied the particularity requirements of Rules of Civil Procedure. Defendants' contention that Clipper's papers are insufficient to qualify as a 59(e) motion is without merit.
 
 B. Failure to Raise New Grounds
 
 20
 Defendants contend that Clipper's motion, without affidavits, advances no new grounds for vacating the judgment.[11] A motion which simply rehashes arguments heard at trial, defendants contend, does not properly lie under 59(e). Assuming arguendo that Clipper's 59(e) motion raises no new grounds, it nevertheless constitutes a proper 59(e) motion.
 
 
 21
 Rule 59(e) provides a mechanism by which a trial judge may alter, amend, or vacate a judgment. See Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Rule 59(e) provides an efficient mechanism by which a trial court judge can correct an otherwise erroneous judgment without implicating the appellate process. As noted by this court in United States v. Walker, 601 F.2d 1051, 1058 (9th Cir. 1979): 'Errors in the trial court may be most speedily corrected by the trial judge. Frequently a trial judge has had to rule on difficult questions under time pressures and without thorough briefing by the parties. A motion for reconsideration may, in some instances, avoid the necessity of an appeal.'[12] Clipper's motion enabled the trial judge to reconsider the validity of his judgment, and to vacate or alter it as he saw fit. As such, it was valid as a 59(e) motion.[13] Since Clipper filed its Notice of Appeal within 30 days after the district judge denied its Rule 59(e) motion, we therefore have jurisdiction, pursuant to Rule 4(a), to review the order granting summary judgment for defendants.
 
 STANDARD OF REVIEW
 
 22
 Summary judgment is properly granted when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Gaines v. Haughton, 645 F.2d 761, 769-70 (9th Cir. 1981). All facts and inferences drawn therefrom must be viewed in the light most favorable to the non-moving party. The moving party has the burden to establish the non-existence of any triable issue of fact. The defendants, here, established the nonexistence of a material issue of fact by making several admissions for the purposes of the motion. In their memorandum accompanying the motion, the defendants made the following admissions:
 
 
 23
 For the purposes of this motion, the court may assume the existence of the conspiracy alleged in Clipper's interrogatory responses. It may further assume that everything was done that Clipper says was done to further that conspiracy.
 
 
 24
 Again, for the purpose of this motion, the court may accept Clipper's allegations as fact and assume that defendants expressly agreed among themselves not to cut rates to divert traffic from one another--or to put it more bluntly, that they agreed that their rates would be exactly the same. Such an agreement would be perfectly lawful and immunized from antitrust liability.
 
 
 25
 This court may assume for purposes of this motion that the object behind each of the protests was just what Clipper says it was--that the defendants who filed them were simply trying to eliminate or destroy competition.
 
 
 26
 The defendants, not once but three times, expressly represented to the district court that it could 'assume for the purposes of this motion' that they had done exactly what Clipper alleged in its complaint. Their consistent position was that as a matter of law, the conduct alleged in the complaint did not state a legally-cognizable claim for damages under the antitrust laws. Therefore, we need only decide whether the district court correctly determined that, under the facts alleged, Clipper's antitrust claims were barred as a matter of law. As the district court recognized in its order granting summary judgment for the defendants, '[w]ith regard to the motions for summary judgment, the issues are purely legal ones.'[14]
 
 THE MERITS
 
 27
 As noted above, Clipper alleged in its complaint three ways in which the defendants' protests to the ICC constituted antitrust violations. First, the protest was alleged to be a direct interference with competitive activity, and a sham protest not immune under the Noerr-Pennington doctrine. Second, in protesting to the ICC, defendants allegedly furnished false information to the ICC, Clipper's business. Lastly, defendants' protest was simply an act in furtherance of an independent ratefixing violation of the antitrust laws.[15]
 
 
 28
 I. THE PROTESTS AND NOERR PENNINGTON IMMUNITY
 
 
 29
 Defendants contend that the district court properly found that the protests before the ICC were immunized from antitrust liability because of the Noerr-Pennington doctrine. Under the Noerr-Pennington doctrine, bona fide efforts to obtain or influence legislative, executive, judicial or administrative actions are immune from antitrust liability. See 7 von Kalinowski, Antitrust Laws and Trade Regulation Sec. 46.04 (1980). If the purported effort to influence or obtain government action is in reality only an attempt to interfere with the business relationships of a competitor, however, the activity does not enjoy antitrust immunity. Noerr, 365 U.S. at 144, 81 S.Ct. at 533.
 
 
 30
 The evolution of Noerr-Pennington immunity, and its concomitant sham exception, begins in Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).[16] In Noerr, truck operators and their trade association sued railroads, an association of presidents of those railroads, and a public relations firm alleging the defendants conspired to restrain trade in violation of Secs. 1 and 2 of the Sherman Act. Specifically it was alleged that the defendants engaged in a 'publicity campaign against the truckers designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business, to create an atmosphere of distaste for the truckers among the general public, and to impair the relationships existing between the truckers and their customers.' Id. at 129, 81 S.Ct. at 525.
 
 
 31
 The defendants argued that their activities could not create liability under the Sherman Act when they were only trying to inform the public and the legislature of certain facts. The Supreme Court agreed, noting 'that no violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws.' Id. at 135, 81 S.Ct. at 528. The Court held that even if the defendants' sole purpose in seeking to influence the passage and enforcement of laws was to destroy the truckers' business, the immunity remained. 'The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so.' Id. at 139, 81 S.Ct. at 530.
 
 
 32
 In this same case the Court also recognized that a sham attempt to influence governmental action would not be immune: 'There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified.' Id. at 144, 81 S.Ct. at 533.
 
 
 33
 The antitrust immunity established in Noerr for bona fide attempts to influence governmental action was reaffirmed in United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In Pennington, a small coal company cross-claimed against the UMW, trustees, and certain large coal operators, alleging that they had conspired to restrain and to monopolize interstate commerce in violation of Secs. 1 and 2 of the Sherman Antitrust Act. The Union and large companies agreed upon steps to exclude the marketing, production and sale of non-union coal. Together they successfully approached the Secretary of Labor to obtain a minimum wage requirement for employees of contractors selling coal to the TVA, making it difficult for small companies to compete in TVA term contracts. Other executive action was sought and obtained.
 
 
 34
 The Court held that the acts seeking governmental action were immune from antitrust liability. The Court noted that 'Noerr shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.' Id. at 670, 85 S.Ct. at 1593. '[T]he legality of the conduct 'was not at all affected by any anti-competitive purpose it may have had,' . . . even though the 'sole purpose in seeking to influence the passage and enforcement of laws was to destroy . . . competitors . . .." Id. at 669, 85 S.Ct. at 1593.
 
 
 35
 In California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Court extended the Noerr-Pennington doctrine to attempts to influence administrative and judicial (adjudicatory) bodies, while holding that a cause of action had been stated under the 'sham' exception. In Trucking, a group of highway carriers operating in California sued a group of interstate highway carriers, alleging violations under Sec. 4 of the Clayton Act. The first group of highway carriers alleged that the second group conspired to institute state and federal proceedings to resist and defeat applications by the first group to acquire operating rights or to transfer or register those rights.
 
 
 36
 The Trucking Court held that the Noerr-Pennington doctrine protects genuine efforts to influence adjudicatory bodies. The Court noted, however, that the allegations in that case gave rise to a cause of action under the sham exception to that doctrine. The Court noted that allegations that proceedings were instituted without probable cause, and regardless of merit, state a cause of action which falls within the exception to Noerr. Although the Court did not set forth the parameters of the sham exception, it did list examples of activity which might come within the exception.[17]
 
 
 37
 In Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), on remand, 360 F.Supp. 451 (D.Minn. 1973), aff'd, 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974), Otter Tail Power monopolized the distribution of power to various communities. Otter Tail prevented those communities from creating their own marketing organizations by instituting and supporting litigation designed to prevent or delay the establishment of the municipal power systems. The United States sued Otter Tail under the antitrust laws. Rendering its decision before Trucking Unlimited had been decided, the district court held that Otter Tail did not enjoy Noerr immunity, because that immunity did not extend to efforts to influence the administrative or judicial process.
 
 
 38
 The Supreme Court remanded in light of Trucking Unlimited, noting that although Noerr immunity might be applicable in this case, so might the sham exception. Id. at 380, 93 S.Ct. at 1031. On remand, the district court held that Otter Tail's conduct fell within the sham exception.[18] 360 F.Supp. 451 (D.Minn.1973). The Supreme Court summarily affirmed. 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974).
 
 
 39
 The defendants in the instant case argue on appeal that their conduct does not fall within the sham exception because the evidence shows the conduct was intended to influence governmental action. At the district court, however, the defendants admitted that for the purposes of this motion 'the object behind the protests [was] . . . simply . . . to eliminate or destroy competition.'
 
 
 40
 It is unquestionably true, as defendants assert, that Noerr-Pennington confers antitrust immunity for conduct genuinely intended to influence governmental action. Whether something is a genuine effort to influence governmental action, or a mere sham, is a question of fact. The facts here show, however, that this conduct is not the type that is entitled to immunity; it is not in fact conduct intended to influence governmental action.
 
 
 41
 Clipper, for the purposes of the summary judgment motion, has sufficiently shown that defendants' protests were spurious, baseless, and prosecuted without regard to their merit, intended only to delay competitive action, not to influence governmental action. The defendants, in advance of Clipper's filing reduced tariffs, agreed through RMMTB to institute proceedings before the ICC for the purpose of restricting and prohibiting competition from any freight forwarders. In furtherance of this agreement, the defendants--particularly RMMTB--would automatically protest any forwarder tariff, regardless of the rate's legality or competitive justification. These protests were put forward in the interest of maintaining parity between the rates of freight forwarders and motor carriers and were prosecuted without regard to the merits of the protest. Therefore, the defendants' intent, admitted for the purpose of their motion, was not to induce favorable administrative action from the ICC, but rather to saddle Clipper with such onerous regulatory and administrative burdens that it would be forced to withdraw the rates.
 
 
 42
 The defendants contend on appeal that their protests were filed and prosecuted with the intent of influencing governmental action. The defendants contend that the undisputed facts establish that the protests were efforts to influence governmental action. We disagree.
 
 
 43
 The fact that their intent was to prevent price competition by Clipper is not determinative. Genuine efforts to induce governmental action are shielded by Noerr even if their express and sole purpose is to stifle or eliminate competition. However, Clipper sought to bring its claims within the 'sham' exception by contending that the defendants protested rates automatically, without regard to merit or possible success before the ICC, and therefore without any intent to induce favorable action by the ICC. These allegations fall within the sham exception as a matter of law. Baseless protests, instituted without regard to merit, are 'nothing more than an attempt to interfere directly with the business relationships of a competitor.' Noerr, 365 U.S. at 144, 81 S.Ct. at 533.
 
 
 44
 On remand, Clipper will need to establish the facts supporting this theory. However, we note that while the success or failure of the protests is not singularly determinative of a party's intent, this Circuit regards such success or failure as indicative of a party's intent. See Ernest W. Hahn, Inc. v. Codding, 615 F.2d 830 at 841 n.13 (9th Cir. 1980). Here, defendants' protests to Clipper's reduced rates were unsuccessful. This, combined with the assumed facts as to the defendants' intent, is enough to prevent the defendants from being cloaked with Noerr immunity as a matter of law.
 
 
 45
 TRUCKING UNLIMITED'S APPLICATION OF THE SHAM EXCEPTION
 
 
 46
 Defendants' more substantial contention is that Trucking Unlimited itself precludes application of the sham exception in this case. Defendants contend that to fall within the sham exception, Trucking requires that the alleged misconduct (1) consist of a pattern of repetitive claims; (2) be baseless; and (3) bar access to the governmental body. We disagree. Although all of these elements can be found under the peculiar facts of Trucking Unlimited, nothing in Trucking Unlimited requires that all of these elements be present for the sham exception to apply.
 
 PATTERN OF REPETITIVE CLAIMS
 
 47
 Defendants claim that because they protested only one tariff, Tariff 55, the sham exception does not apply and they retain Noerr immunity. Assuming that defendants' acts constituted only one protest, we do not find any merit in this contention.[19]
 
 
 48
 An examination of the theoretical underpinnings of Noerr-Pennington and the sham exception indicates that it is unnecessary to allege and prove more than the institution of a single suit or protest to invoke the sham exception.[20] The Noerr-Pennington doctrine is itself a judicially created exception to the application of the antitrust laws based on the first amendment.[21] First amendment protection is extended and application of the antitrust laws suspended because a legitimate effort to influence government action is part of the guaranteed right to petition. Trucking Unlimited, 404 U.S. at 510, 92 S.Ct. at 611.
 
 
 49
 The sham exception, on the other hand, reflects a judicial recognition that not all activity that appears as an effort to influence government is actually an exercise of the first amendment right to petition. At times this activity, disguised as petitioning, is simply an effor to interfere directly with a competitor. In that case, the 'sham' petitioning activity is not entitled to first amendment protection, because it is not an exercise of first amendment rights.
 
 
 50
 If the activity is not genuine petitioning activity, the antitrust laws are not suspended and continue to prohibit the violating activities. Because application of the antitrust laws is not suspended, it will prohibit sham activity, whether that activity consists of single or multiple sham suits. This analytical framework does not permit a conclusion that single sham suits are protected under Noerr.[22]
 
 
 51
 Indeed, the Court in Trucking Unlimited mentioned several types of activity that could constitute antitrust violations, despite the fact that only single instances of conduct are involved. Specifically, the Court mentioned '[u]se of a patent obtained by fraud to exclude a competitor from the market,' and 'bribery of a public purchasing agent.' 404 U.S. at 512-13, 92 S.Ct. at 612-13.[23] These examples involve only a single act, yet the Court notes that they are prohibited by the antitrust laws. Given this language, and absent any contrary indication by the Supreme Court,[24] there is no reason to believe that the Court intended to extend the sham exception only to cases involving repetitive claims.[25]
 
 
 52
 Given the theory supporting both the Noerr-Pennington doctrine and the sham exception, and absent any contrary indication from the Supreme Court, we hold that a single suit, or in this case a single protest, is sufficient to invoke the sham exception.
 
 BASELESS CLAIMS
 
 53
 Defendants contend that to come within the sham exception, plaintiff must allege and show that the claims prosecuted were baseless. Defendants claim that since their claims were not baseless, the grant of summary judgment is proper. We disagree. Assuming that baseless claims must be shown, the record before the district court reveals that the defendants' protests of Tariff 55 were baseless.
 
 
 54
 The defendants admitted arguendo that their protests were filed automatically and without regard to merit. This establishes that defendants' protests were baseless for the purposes of the motion. Indeed, the fact that defendants lost all protests establishes a sufficient showing of baselessness for the purposes of a summary judgment motion. This is certainly sufficient to present a triable issue of fact.
 
 ACCESS DENIAL
 
 55
 Relying again on Trucking Unlimited, defendants contend that Clipper cannot invoke the sham exception unless it establishes that defendants' actions deprived Clipper of access to the ICC. Defendants claim that because Clipper was successful before the ICC in fighting the protests, and also made numerous filings with the ICC during the protest period, Clipper was not deprived of either actual or meaningful access to the ICC. Defendants' contention is erroneous.
 
 
 56
 The defendants claim that Trucking Unlimited requires access barring as a prerequisite to application of the sham exception. In Trucking Unlimited the Court noted that the plaintiffs alleged, in establishing a sham claim, that defendants 'petitioning' activity denied them free and unlimited access to administrative and judicial tribunals. 404 U.S. at 511, 92 S.Ct. at 612. The Court, in holding that a cause of action was stated under the sham exception, based its decision on alternative grounds--access barring and also the fact that the administrative and judicial process had been abused. Id. at 513, 92 S.Ct. at 613. In Trucking Unlimited, the concepts of access barring and abuse of judicial process were treated interchangeably because the defendants' intervention in the administrative process in that case involved both. Subsequent decisions of the Supreme Court indicate that the access-barring language of Trucking Unlimited referred only to the particular circumstances in that case, and did not establish access barring as a prerequisite to a sham exception suit.
 
 
 57
 In Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), on remand, 360 F.Supp. 451 (D.C.Minn.1973), aff'd mem. 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974), the Court held that a cause of action under the sham exception was made out in the absence of any allegation of access barring. The Otter Tail defendants used litigation to suppress competition, and in fact gave the plaintiffs greater access to courts by instituting lawsuits. Otter Tail indicates that the term 'access barring' refers only to one type of abuse of judicial or administrative process and that 'access barring' need not be present for the maintenance of a suit under the sham exception.[26]
 
 
 58
 Defendants contend that despite the Supreme Court's decision in Otter Tail, access barring is a prerequisite to a sham suit in the instant case. They contend that (1) the cases where access barring was not required are distinguishable from the instant case, because in those cases there was no administrative body involved to which access could be denied. Rather, in those cases the petitioning activity was first directed to courts. In this case, however, there was an administrative body (the ICC) to which access could be denied; and (2) Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers, 542 F.2d 1076 (9th Cir. 1976), cert. denied, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977), requires access barring as an element of a sham claim. We are not persuaded by either contention.
 
 
 59
 Neither Otter Tail nor any subsequent Supreme Court case indicates that access barring is required when the petitioning activity is directed towards an administrative body although it is not required if the petitioning is directed to the courts. Moreover, such a holding seems senseless. The same dangers that the antitrust laws seek to prohibit flow from instituting sham administrative proceedings as flow from instituting sham judicial proceedings. Harassment of a rival through an administrative proceeding may have the same anticompetitive effect as harassment through the court system. We therefore see no reason to distinguish between cases in which there is primary resort to an administrative body and cases where the primary resort is to the court system. In fact, Trucking Unlimited, when discussing the dangers of abuse of process, groups judicial and administrative process together. 404 U.S. at 513, 92 S.Ct. at 613 ('the administrative and judicial processes have been abused').
 
 
 60
 Defendants also suggest that in Franchise Realty this court held that access barring is a necessary element of a sham claim. Defendants, however, ignore the most recent pronouncement of this circuit. In Ernest W. Hahn, Inc. v. Codding, 615 F.2d 830 (9th Cir. 1980), this court found a cause of action under the sham exception was stated despite the absence of access barring. The Hahn court stated:
 
 
 61
 It has been suggested that Franchise Realty requires a showing of some activity other than the alleged abuse of process and perhaps a showing that the plaintiff has been barred from meaningful use of the agency or tribunal. See Handgards, Inc. v. Ethicon, Inc., 601 F.2d 986, 998 (9th Cir. 1979) (Kennedy, J., concurring), cert. denied, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980). While Franchise Realty may be read in this manner . . . in view of what the decision itself says when discussing Otter Tail and the later Supreme Court decision in Vendo, we decline to follow this interpretation under the alleged facts in this case.' 615 F.2d at 841 n.14.[27]
 
 
 62
 Defendants also contend that we must require proof of access barring here if 'the Noerr-Pennington doctrine is to protect protest activities at all.' Defendants claim that if we did not require access barring, every competitor who was adversely affected by the filing of a protest would file an antitrust suit against the protesting party. This increased litigation, defendants claim, would deter the exercise of first amendment rights. We disagree.
 
 
 63
 The Supreme Court in Otter Tail held that a sham exception cause of action was stated, despite the absence of access barring. We see no reason to hold otherwise here. All laws create the possibility of litigation. Congress, in its wisdom, enacted the antitrust laws. We have no cause here to second guess the judgment of Congress. Defendants have not shown how their first amendment rights have been infringed by the antitrust laws, nor have they presented any reason to believe that our holding will adversely affect the future exercise of first amendment rights. To prove an antitrust violation under the sham exception, a plaintiff must prove the usual elements of any antitrust violation in addition to proving that a defendant's actions that ostensibly appear as petitioning activity were not genuine efforts to influence governmental action; rather they were nothing more than an attempt to interfere directly with the business relationships of a competitor. This is a heavy burden. Neither the first amendment nor the antitrust laws require that we make it any heavier by adding the requirement of access barring.
 
 
 64
 We have found no precedent nor any reason to require access barring before the sham exception can be invoked.[28] Thus, we conclude that to invoke the sham exception, some abuse of process, although not necessarily access barring, must be alleged. Because it was sufficiently alleged here, the summary judgment was improper.
 
 FRAUD
 
 65
 In its amended complaint Clipper alleged that the defendants provided the ICC with fraudulent information in connection with the rate protests, and that therefore the defendants were liable for treble damages under the Sherman Act.[29] Specifically Clipper claimed that the defendants, '[t]o give their sham protests the appearance of merit and thereby subvert the purpose of Sec. 15a(3)[30], . . . knowingly understated their costs; they knowingly overstated the forwarders' costs; they deliberately misrepresented to the ICC that Clipper's charges were substantially below defendants' charges and therefore constituted 'destructive competition' in violation of national transportation policy; and they made countless other misrepresentations of both fact and law . . ..'
 
 
 66
 The district court's order did not specifically deal with the fraud issue; hence it did not address a rule of law known as the Walker Process doctrine, which provides antitrust liability for the commission of fraud on administrative agencies, for predatory ends. We therefore remand to the district court for a determination of whether the defendants' actions constituted an antitrust violation in that they perpetrated fraud on an administrative agency, for predatory ends.
 
 
 67
 Imposing antitrust liability for supplying fraudulent information in an administrative proceeding derives from Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). In Walker Process the question was 'whether the maintenance and enforcement of a patent obtained by fraud on the Patent Office may be the basis of an action under Sec. 2 of the Sherman Act, and therefore subject to a treble damage claim by an injured party under Sec. 4 of the Clayton Act.' Id. at 173, 86 S.Ct. at 348. The Supreme Court held that 'the enforcement of a patent procured by fraud on the Patent office may be violative of Sec. 2 . . . provided the other elements necessary to a Sec. 2 case are present.' Id. at 174, 86 S.Ct. at 348.[31]
 
 
 68
 This Circuit has never clearly extended the Walker Process doctrine to cases not arising in a patent context.[32] We are directly presented with the issue. We hold that the fraudulent furnishing of false information to an agency in connection with an adjudicatory proceeding can be the basis for antitrust liability, if the requisite predatory intent is present and the other elements of an antitrust claim are proven.
 
 
 69
 As the Supreme Court noted in Trucking Unlimited, the adjudicatory sphere is much different from the political sphere. There is an emphasis on debate in the political sphere, which could accommodate false statements and reveal their falsity. In the adjudicatory sphere, however, information supplied by the parties is relied on as accurate for decision making and dispute resolving. The supplying of fraudulent information thus threatens the fair and impartial functioning of these agencies and does not deserve immunity from the antitrust laws. See, e.g., Israel v. Baxter Laboratories, Inc., 466 F.2d 272, 275-80 (D.C.Cir.1972).
 
 
 70
 Because of the admissions made in defendants' memorandum accompanying its motion for summary judgment, we must assume as proven that the defendants knowingly provided the ICC with fraudulent information in connection with their rate protests in determining whether a claim based on the furnishing of fraudulent information is stated sufficiently to withstand summary judgment. Clipper's specific allegations which as judicial admissions are to be accepted as proven are set forth above. We find that these assumed facts are sufficient to establish a triable cause of action under the antitrust laws.
 
 
 71
 Defendants contend, however, that no cause of action based on fraud is stated because: (1) their acts and statements are immune under the first amendment; (2) the ICC ultimately found for Clipper and therefore the defendants' acts did not defraud the ICC; and (3) access barring is required and Clipper was not denied access to the ICC. We are not persuaded by any of these contentions.[33]
 
 
 72
 There is no first amendment protection for furnishing with predatory intent false information to an administrative or adjudicatory body. The first amendment has not been interpreted to preclude liability for false statements. For example, defamatory statements can be made the basis for liability. See New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). 18 U.S.C. Sec. 1001 imposes criminal penalties for knowingly and wilfully concealing or misrepresenting material facts before any department or agency of the United States. Courts uniformly punish perjury. As the Supreme Court stated in Gertz v. Robert Welch, Inc., 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974); 'there is no constitutional value in false statements of fact.' Contrary to defendants' assertions, there is simply no basis to hold that deliberately misrepresenting facts to an administrative body for anticompetitive purposes enjoys blanket first amendment protection.
 
 
 73
 Defendants contend that if first amendment protection is not extended to their statements, robust debate would be chilled. While we recognize that under certain circumstances allowing the imposition of liability for statements can hamper debate, see New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), this possibility does not require that all such statements be immunized from liability. It may suggest that a court should adopt a stricter standard of proof, or certain additional elements should be required. See id. (interest in public debate requires that to establish defamation by media against public official, plaintiff show statement was made with knowledge of or reckless disregard for falsity). Regardless of degree of protection which might be found appropriate for protecting defendants' statements from antitrust liability, those limits have been exceeded here. Clipper claims defendants knew the falsity of their statements, and made those statements in a deliberate attempt to mislead a regulatory body. We can conceive of no stricter standard than that satisfied by the facts alleged by Clipper. We see no reason to extend first amendment protection here.
 
 
 74
 Defendants contend that no cause of action for fraud is stated because the ICC rejected defendants' arguments and found for Clipper, and therefore the ICC was not defrauded by the defendants. This analysis is deficient. First, neither Walker Process, nor subsequent cases, see Israel v. Baxter Laboratories, 466 F.2d 272 (D.C.Cir.1972); Woods Exploration & Producing Co. v. Aluminum Co. of America, 438 F.2d 1286 (5th Cir. 1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), require that the body on whom the fraudulent misstatements are pressed ultimately believe those statements. Moreover, the underlying theoretical basis of the Walker Process doctrine does not support such a narrow interpretation of the doctrine.
 
 
 75
 Walker Process recognizes that fraudulently supplying information can result in monopolization, and therefore violate the antitrust laws. The doctrine is not concerned with whether the body intended to be influenced by the information is ultimately defrauded; a cause of action is established so long as the elements of an antitrust claim are alleged and the violation is executed through fraudulently supplying information. Whether the body is ultimately defrauded by the information may affect the extent of the monopolization--and thus affect damages.
 
 
 76
 We find significant support for our findings in both policy and practice. Adjudicatory procedures will not always ferret out misrepresentations. Administrative bodies[34] and courts, however, rely on the information presented by the parties before them. They seldom, if ever, have the time or resources to conduct independent investigations. The recognition, however, of a private right of action based on the fraudulent misrepresentation, might be sufficient incentive to induce parties not to fraudulently misrepresent facts.
 
 
 77
 Moreover, we are not persuaded that Clipper should be deprived a remedy and defendants should be immunized from liability simply because Clipper was not denied access to the ICC. There is simply no basis for requiring a denial of access to the agency as a prerequisite for an antitrust claim for fraud. Defendants contend that both Trucking Unlimited and Franchise Realty require access barring in this context. Neither of these cases, however, involved claims arising from the furnishing of fraudulent information for predatory purposes. Moreover, Otter Tail establishes, as noted earlier, that an antitrust claim based on litigation can exist without access barring. The grant of summary judgment on this claim was not proper.
 
 IV. OVERALL SCHEME
 
 78
 Clipper alleges, finally, that the defendants engaged in a rate fixing conspiracy, part of which involved defendants' protests to the ICC, and that this conspiracy constitutes a separate violation of the antitrust laws independent of any petitioning activity that might enjoy Noerr immunity. For several years the defendants engaged in a practice by which they refrained from offering lower rates to each other's customers. This practice was enforced by censure, and if necessary, by vigorous protests against competitive rate publications. Clipper contends that this conduct constitutes a horizontal conspiracy to fix prices and allocate the relevant market, per se violative of the Sherman Act. Moreover, defendants prosecuted deliberately false protests against Clipper's lower rates to enforce and protect their illegal price fix/customer allocation. Clipper thus contends that the defendants' prosecution of litigation in furtherance of their unlawful scheme constituted an antitrust violation, and the overall scheme was not excused by immunity provisions in the ICA nor Noerr immunity.
 
 
 79
 The defendants assert that Sec. 5a of the ICA, 49 U.S.C. Sec. 5b, recodified as 49 U.S.C. Sec. 10706, provides immunity for this conspiracy to fix rates. Furthermore, the defendants contend that the Noerr-Pennington doctrine protects petitioning activity whether or not that activity is in furtherance of an independent antitrust violation. In its summary judgment order, the district court did not specifically consider the viability of this 'overall scheme' contention.
 
 
 80
 An antitrust violation does not enjoy immunity simply because an element of that violation involves an action which itself is not illegal. In Trucking Unlimited the Court emphasized the existence of liability for antitrust violations, even though an integral part of the violation may involve otherwise legal and protected activity. The court stated:
 
 
 81
 Petitioners, of course, have the right of access to the agencies and courts to be heard on applications sought by [competitors]. That right, as indicated, is part of the right to petition protected by the First Amendment. Yet that does not necessarily give them immunity from the antitrust laws.
 
 
 82
 It is well settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute. 404 U.S. at 513-14, 92 S.Ct. at 613.
 
 
 83
 Similarly, we hold that when there is a conspiracy prohibited by the antitrust laws, and the otherwise legal litigation is nothing but an act in furtherance of that conspiracy, general antitrust principles apply, notwithstanding the existence of Noerr immunity. In so holding we are acting consistently with the theoretical underpinnings of the Noerr doctrine. As we noted above, Noerr immunity is based on the first amendment right to petition and to seek to influence governmental action. See Trucking Unlimited, 404 U.S. at 510 12, 92 S.Ct. at 611 12. When, however, the petitioning activity is but a part of a larger overall scheme to restrain trade, there is no overall immunity. As the Court noted in Trucking Unlimited:
 
 
 84
 First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' . . . which the legislature has power to control. Certainly the constitutionality of the antitrust laws is not open to debate. . . . If the end result is unlawful, it matters not that the means used in violation may be lawful. 404 U.S. at 515, 92 S.Ct. at 614.
 
 
 85
 We agree. If Clipper can prove that the defendants engaged in activities which violated the antitrust laws, those violations do not become immune simply because the defendants used legal means--protests before the ICC--as a means to enforce the violations.
 
 
 86
 We find significant support for our holding in Supreme Court and circuit court decisions. United States v. Singer Manufacturing Co., 374 U.S. 174, 83 S.Ct. 1776, 10 L.Ed.2d 823 (1963), held that a cause of action under the antitrust laws was stated when an integral part of the violation was prosecution of patent infringement actions. In Singer, the defendants conspired to eliminate Japanese competition from the American sewing machine market. To eliminate this competition, the defendants assigned patents and prosecuted patent infringement actions against Japanese competitors. The Supreme Court held that this aggregation of patents and prosecution of infringement suits constituted an actionable violation of the antitrust laws.
 
 
 87
 The instant case is analogous to Singer. Here, the allegation is that the defendants conspired to fix rates and allocate customers, and used the protest mechanism of the ICC to further this conspiracy. Protests before the ICC are legitimate mechanisms for enforcing rights. Even if the protests to the ICC were legitimate, if they were part of a larger antitrust conspiracy, the conspiracy is subject to the antitrust laws.
 
 
 88
 This Circuit has embraced the Singer holding, at least in the context of patent infringement suits. In Handgards, Inc. v. Ethicon, Inc., 601 F.2d 986, 994 (9th Cir. 1979), cert. denied, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980), this court stated that:
 
 
 89
 Kobe [Kobe, Inc. v. Dempsy Pump Co., 198 F.2d 416 (10th Cir.), cert. denied, 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952)] and its progeny, among which is Rex Chainbelt [Rex Chainbelt, Inc. v. Harco Products, Inc., 512 F.2d 993 (9th Cir.), cert. denied, 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49 (1975)], hold that a patentee may incur antitrust liability for even the good faith prosecution of a valid patent where it is shown that the infringement suit 'was brought in furtherance and as an integral part of a plan to violate the antitrust laws.' 601 F.2d at 994. (Citations omitted). See also Mach-Tronics, Inc. v. Zirpoli, 316 F.2d 820, 830-31 (9th Cir. 1963).
 
 
 90
 The fact that the Ninth Circuit cases involving enforcement litigation as an integral part of an overall scheme which violates the antitrust laws arise in the context of patent litigation does not intimate that such a theory is only viable in the patent context.[35] We see no reason for refusing to extend the rationale of these patent-antitrust cases to overall antitrust schemes in other contexts.
 
 
 91
 The Tenth Circuit has extended the Singer doctrine to protests involving the ICC. In Webb v. Utah Tour Brokers Association, 568 F.2d 670 (10th Cir. 1977), the Tenth Circuit held that antitrust liability attached to tour operators who used protests to the ICC as a means to further an illegal boycott. In finding liability the Webb court stated:
 
 
 92
 It is apparent that in the case at bar the trial court was correct in recognizing that the activities of the defendants went far beyond the use of legal procedures in order to protect the public interest. The activities here were designed to and succeeded in bringing about a boycott of the plaintiffs, which reduced their competitive significance and caused a substantial loss.
 
 
 93
 Accordingly, we must conclude that the governing law is that set forth in the boycott cases rather than the exemption decisions in Noerr Motor Freight, Inc. and its progeny. Id. at 676.
 
 
 94
 The defendants contend, however, that Noerr-Pennington protects petitioning activity even if it is a part of an independent antitrust violation. As support, defendants cite Pennington: 'Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.' 381 U.S. at 670, 85 S.Ct. at 1593.
 
 
 95
 Contrary to the defendants' assertions, this statement does not provide them with Noerr immunity for an overall and independent antitrust violation. This statement, rather, provides immunity only for the narrow petitioning activity, if done with the requisite intent to influence government action. Clipper, in this cause of action, is not challenging merely the petitioning activity. Rather, it challenges the defendants' entire course of conduct, which allegedly resulted in the price fixing and trade restraints. No one has contended that the alleged price-fix conspiracy was intended to influence governmental actions. The defendants' actions do not enjoy immunity, even though a part of the actions may have involved protected first amendment petitioning. The reach of the Noerr-Pennington doctrine is not that extensive, and the antitrust laws are not that impotent.
 
 
 96
 Clipper, aided by the judicial admissions of the defendants, has established that defendants conspired to fix prices and restrain trade, and that this conspiracy was in part enforced by protests to the ICC. Clipper has therefore stated a claim for relief as a matter of law. The defendants contend, however, that whatever conspiracy they engaged in was protected by Sec. 5a of the ICA. Section 5a of the ICA provides immunity from the antitrust laws for collective rate agreements in certain circumstances. In ruling on the defendants' summary judgment motion, the district court did not determine whether such circumstances existed here. Clipper, in its briefs, contends that there was no such ICA immunity here. On the record this court is not in a position to determine the existence of Sec. 5a immunity. That determination involves the resolution of disputed issues of fact, including the need for ICC approval of questioned rates, the existence of ICC approval of the rate bureau agreement, the extent of any such approval, and, assuming approval, the existence of any activities by the defendants beyond that approval. We therefore remand this issue to the district court to determine whether the defendants' activities enjoyed Sec. 5a immunity for the alleged conspiracy to price-fix and restrain trade.
 
 DAMAGES
 
 97
 Clipper alleged that the defendants' conduct caused Clipper to be damaged in the amount of thirty million dollars, and it asked for treble that amount. Clipper's damage claim rests on three distinct theories: (1) once Clipper published and defendants protested the $1,056 rate, Clipper was effectively barred from publishing its $842 rate until the investigation of the $1,056 rate was resolved in Clipper's favor--two years later. Clipper seeks the damages resulting from the two-year delay in publishing the $842 rate; (2) Clipper seeks to recover costs incurred in defending against defendants' sham protests;[36] and (3) the ICC investigation of the $1,056 rate, caused by the defendants' protests, placed a 'cloud' on the legality of that rate during the time it was under investigation. Shippers will not generally use a rate when it is under investigation. Clipper seeks to recover for the business lost or deterred by this cloud.
 
 
 98
 Defendants respond that Clipper's damage claim is barred by Keogh v. Chicago & N.W. Ry. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922).[37] The district court agreed with the defendants, holding: 'Furthermore, plaintiff's damage claims, which rest on assumptions as to action that would have been taken by the ICC in the absence of defendants' alleged antitrust violations, are barred by Keogh v. Chicago & N.W. Ry. Co. . . .' (citation omitted). We disagree.
 
 
 99
 In Keogh a shipper sued several carriers, alleging that the carriers had conspired to set arbitrarily high rates, and that this conspiracy violated the antitrust laws. The plaintiff claimed that the rate filed by the carrier defendants was illegal, even though the rate had received ICC approval. Plaintiff sought as damages the difference between the rate which had received ICC approval and some hypothetical, unset rate that would have been in effect, absent the conspiracy. The Court held that no antitrust action was stated; the exclusive remedy was held to be contained in the Act to Regulate Commerce (now the ICA). The Commerce Act provided for a damage recovery with illegal rates. The court further noted that the challenged rate was legal, having received ICC approval. They also noted that judicial antitrust relief here would frustrate the intent of Congress--Congress having passed the Commerce Act to insure uniform rates. Judicial relief would result in a lower rate to plaintiff than to other shippers, and thus be a discriminatory rebate. Finally, the court noted that judicial relief here would require the court to speculate on the level the rate would have been set by carriers and approved by the ICC absent the conspiracy, thereby assuming what ICC action would be.
 
 
 100
 None of these decisional bases appear in the instant case. Keogh is not even arguably applicable as a bar to Clipper's second and third damage claims. Clipper's second damage claim is for the costs of defending against the protests. There is no applicable ICC remedy to recover these costs. An award of these costs by a court would not interfere with the ICC, nor would it be discriminatory. Finally, awarding these damages does not require the court to make any assumptions as to ICC actions.
 
 
 101
 The same analysis applies to Clipper's third damage claim to recover for profits lost because of the 'cloud' on Clipper's rate while it was under investigation. There is no ICC remedy applicable. Awarding damages for this would not interfere with the regulatory framework of the ICC. Finally, although it might be hard to prove these damages, the proof does not require that any assumptions about ICC action be made.
 
 
 102
 Finally, Keogh does not apply to bar Clipper's first damage claim. Clipper claims that it was damaged because the defendants' protests prevented Clipper's filing of the $842 rate for two years. Unlike Keogh, there is no remedy under the ICA for Clipper's claim. Moreover, it is not a question of a challenge to the legality of a rate approved by the ICC. Here, the claim is that defendants' actions delayed for two years the filing of a rate--which the ICC ultimately approved. Relief here would not disturb any uniform rates; it would do nothing to ICC-approved rate structure. Finally, judicial relief here would not involve the speculation that was at issue in Keogh. In Keogh there was no evidence of what the legal ICC approved rate would be absent the conspiracy. Here the allegations indicate that Clipper would have filed an $842 rate, and the subsequent ICC approval suggests that rate might have been approved two years earlier. Of course, there is no certainty the rate would have been approved. The speculation involved in the instant case, however, in no way approaches the degree of speculation disallowed in Keogh. There is, therefore, no reason to find that Keogh bars this damage claim.
 
 
 103
 There are a myriad of cases that deal with the interplay of regulation and antitrust law.[38] None of these cases precludes Clipper's damage claim. These cases have been careful to note that courts should not displace antitrust law for regulation, in the absence of a clear conflict between antitrust law and regulation. There is no clear conflict here between antitrust and regulation. We therefore find that there is a damage remedy for the antitrust violation.
 
 
 104
 REVERSED and REMANDED.
 
 
 
 *
 Honorable James A. von der Heydt, Chief United States District Judge, District of Alaska, sitting by designation
 
 
 [1]
 Publishing is simply the act of filing a new rate with the ICC
 
 
 [2]
 Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)
 
 
 [3]
 Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922)
 
 
 [4]
 Clipper alleged that RMMTB had always tried to maintain the rates of freight forwarders and carriers at an equal level (parity) and would take forceful action--including protests--to maintain that parity
 
 
 [5]
 This claim was asserted in an amended complaint filed February 3, 1977
 
 
 [6]
 Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965)
 
 
 [7]
 It should be noted that the fact that a party successfully establishes that the Noerr-Pennington exception is inapplicable does not entitle it to a judgment. Such a showing would merely establish that defendant's conduct was subject to the antitrust laws. '[T]he absence of an immunity does not itself establish an antitrust offense. To prevail, the plaintiff must demonstrate that any non-immune behavior meets the standard tests defining an antitrust violation.' Areeda & Turner, Antitrust Law Sec. 201 (1978)
 
 
 [8]
 Because we reverse the grant of summary judgment and remand for a trial on the merits, we need not determine whether the district court judge acted properly in denying Clipper's 59(e) motion to vacate and reconsider
 
 
 [9]
 Rule 59(e) provides that '[a] motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment.' See Pacific Maritime Ass'n v. Quinn, 465 F.2d 108, 109 n.1 (1972) (service, not filing, tolls the running of time to file notice of appeal). Clipper served its 59(e) motion on August 10, 1978, after a July 31, 1978 entry of judgment. Thus, under the rules of time computations provided in Rule 6(a) of the Federal Rules of Civil Procedure, this motion was served within the time strictures established in 59(e)
 
 
 [10]
 Rule 6(d) of the Federal Rules of Civil Procedure states: 'When a motion is supported by affidavit, the affidavit shall be served with the motion . . ..' If, as here, a motion is complete without supporting affidavits, there is no reason to determine whether compliance with this filing requirement is jurisdictional when the affidavits are necessary to make the motion complete. We note, however, the position of the Seventh Circuit in Schy v. Susquehanna Corp., 419 F.2d 1112 (7th Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970)
 In Schy, the Seventh Circuit held that when the plaintiff did not complain of untimeliness of filing affidavits at the district court level, any objection based on that untimeliness was waived on appeal. Id. at 1116. It is questionable whether any proper objection to the untimeliness of these affidavits was raised at trial. Clearly, the defendant-appellees did not object to the late filing of the affidavits. They commented only that the affidavits came too late to substantively oppose the summary judgment. That is irrelevant to the 59(e) motion. A defendant who is not a party to this appeal questioned the timeliness of the affidavits under Rule 59(c) of the Federal Rules of Civil Procedure. Rule 59(c) relates to filing affidavits to support a motion for new trial, and does not apply to a 59(e) motion.
 Because we hold, however, that the 59(e) motion was complete without the affidavits we need not determine whether the 59(c) assertion was sufficient to preserve the question of timeliness for appeal.
 
 
 [11]
 The defendants cite Durkin v. Taylor, 444 F.Supp. 879, 889-90 (E.D.Va.1977); Erickson Tool Co. v. Balas Collet Co., 277 F.Supp. 226, 234 (N.D.Ohio 1967), aff'd., 404 F.2d 35 (6th Cir. 1968); Chastain v. Kelley, 510 F.2d 1232, 1238 n.7 (D.C.Cir.1975), for the proposition that a 59(e) motion is not proper if it advances no new grounds in seeking to vacate a judgment. None of these cases involved the question of whether the motion tolled the running of time to file notice of appeal. All were concerned with whether the motion should have been granted. That is not at issue here. Furthermore, the position of these cases, in holding that a 59(e) motion must raise new grounds, is questionable. There is much authority to the contrary. See Dove v. Codesco, 569 F.2d 807, 809 (4th Cir. 1978); Sonnenblick Goldman Corp. v. Norwalk, 420 F.2d 858, 859 (3d Cir. 1970); Parks v. 'Mr. Ford', 68 F.R.D. 305 (E.D.Pa.1975)
 
 
 [12]
 This Circuit, in determining whether a motion for a new trial was timely, noted in dictum: 'It is true that the motion for an extension of time within which to file a motion for new trial stated no grounds for which a new trial would be sought; but the fact that this motion, considered as an inartfully drawn motion for new trial was so defective that it could not properly be granted, would not serve to render it non-existent. This court has held that in order to suspend the running of the 30-day appeal period allowed by Rule 73(a) a motion for new trial need not be granted or even grantable.' Yanow v. Weyerhaeuser S.S. Co., 274 F.2d 274, 283 (9th Cir. 1959) (en banc), cert. denied, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960)
 Under this liberal approach, Clipper's motion was clearly sufficient to toll the time for filing a Notice of Appeal.
 
 
 [13]
 Because we hold that the record before the trial judge at the time the summary judgment was granted did not support that judgment, we need not consider the late filed affidavits in reaching our holding. Therefore, defendants' contention that the late filed affidavits could not be used to support reversal of summary judgment need not be considered
 
 
 [14]
 Ordinarily, the proper mode of testing the legal sufficiency of the allegations of a complaint is by way of a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). Such a motion can be made at any time, and normally will be made before any substantial discovery has been conducted. However, where, as here, evidence outside the record is submitted to and not excluded by the district court, any such motion must be disposed of by way of the summary judgment procedures specified in Rule 56(c). See Fed.R.Civ.P. 12(b)
 
 
 [15]
 In a short order granting RMMTB's motion for summary judgment, the district court held: (1) Clipper's 'claim, insofar as it is based on defendants' protests before the Interstate Commerce Commission, is barred by the . . .' Noerr-Pennington doctrine. 'Plaintiff's attempt to invoke the 'sham' exception to that immunity . . . is . . . foreclosed by the narrow reading of that exception announced in Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers. . . .' The district court continued: 'Furthermore, plaintiff's damage claims, which rest on assumptions as to action that would have been taken by the ICC in the absence of defendant's alleged antitrust violations are barred by Keogh v. Chicago & N. W. Ry. Co. . . .' The district court order did not individually consider the viability of the theories alleging that the furnishing of fraudulent information constituted an antitrust violation and that the protest was simply part of an independent antitrust violation
 
 
 [16]
 An analysis of cases dealing with the Noerr-Pennington doctrine is subject to the following caveat:
 [E]ach case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and that the opinions in those cases must be read in the light of their facts and of a clear recognition of the essential differences in the facts of those cases, and in the facts of any new case to which the rule of earlier decisions is to be applied.' Maple Flooring Mfrs. Ass'n v. United States, 268 U.S. 563, 579 [45 S.Ct. 578, 583, 69 L.Ed. 1093] (1925).
 
 
 [17]
 Yet unethical conduct in the setting of the adjudicatory process often results in sanctions. Perjury of witnesses is one example. Use of a patent obtained by fraud to exclude a competitor from the market may involve a violation of the antitrust laws, as we held in Walker Process Equipment v. Food Machinery & Chemical Corp., 382 U.S. 172, 175-77, 86 S.Ct. 347, 349-50, 15 L.Ed.2d 247. Conspiracy with a licensing authority to eliminate a competitor may also result in an antitrust transgression. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 707, 82 S.Ct. 1404, 1414, 8 L.Ed.2d 777; Harman v. Valley National Bank, 339 F.2d 564 (CA 9 1964). Similarly, bribery of a public purchasing agent may constitute a violation of Sec. 2(c) of the Clayton Act, as amended by the Robinson-Patman Act. Rangen Inc. v. Sterling Nelson & Sons, 351 F.2d 851 (CA 9 1965)
 There are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations. Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process. Opponents before agencies or courts often think poorly of the other's tactics, motions, or defenses and may readily call them baseless. One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. But once it is drawn, the case is established that abuse of those processes produced an illegal result, viz., effectively barring respondents from access to the agencies and courts. Insofar as the administrative or judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of 'political expression.' 404 U.S. at 512 13, 92 S.Ct. at 613.
 
 
 [18]
 The district court wrote: '[T]he repetitive use of litigation by Otter Tail was timed and designed principally to prevent the establishment of municipal electric systems and thereby to preserve defendant's monopoly . . . the litigation comes within the sham exception to the Noerr doctrine as defined by the Supreme Court in California Transport . . ..' 360 F.Supp. at 451 52
 
 
 [19]
 Whether defendants' protests constitute one or multiple claims is a matter of interpretation. There is one basic tariff--Tariff 55--involved here. During the course of the investigation, however, Tariff 55 was modified by Clipper many times. After each modification the defendants lodged a new protest. Each protest was necessary to preserve the initial protest, or else the newly revised Tariff 55 would go into effect, mooting the prior protest. Whether this constitutes one or multiple claims is unclear. We need not reach that question because we find the sham exception applicable even if there is only a single claim involved
 
 
 [20]
 The conduct which the Trucking Unlimited Court held to fall within the sham exception constituted a pattern of repetitive claims. The defendant highway carriers in Trucking Unlimited continually instituted state and federal proceedings to defeat applications by other highway carriers to acquire operating rights or to transfer or register those rights. In holding that a case of action under the sham exception was stated, the Court referred to 'a pattern of baseless, repetitive claims [which] may emerge [and lead] the factfinder to conclude that the administrative and judicial process have been abused.' 404 U.S. at 513, 92 S.Ct. at 613
 
 
 [21]
 Noerr advanced at least three arguments for the exception, but did not clearly adopt any. First, the Court noted that there is an 'essential dissimilarity' between agreements to seek government action and those agreements traditionally condemned by the antitrust laws. This essential dissimilarity, 'even if not itself conclusive on the question of the applicability of the [antitrust laws], does constitute a warning against treating the defendants' conduct as though it amounted to a common-law trade restraint.' 365 U.S. 136-37, 81 S.Ct. at 528 29
 Second, the Court noted that finding liability for legitimate efforts to effect government 'would substantially impair the power of government to take actions through its legislative and executive that operate to restrain trade.' Id. at 137, 81 S.Ct. at 528. The nature of a representative government requires that the government act on behalf of the people, and to make representation work, requires that the people indicate their wishes to the government.
 Finally, the Noerr Court noted that finding liability for legitimate efforts to influence government would raise serious constitutional questions. The right to petition government is guaranteed in the first amendment. Therefore, it cannot be infringed by a statute, and the court will not 'lightly impute to Congress an intent to invade these freedoms.' Id. at 138, 81 S.Ct. at 530.
 The Court in Pennington was no more definite about the basis for the exception.
 The Trucking Unlimited Court continually spoke to the first amendment right to petition, while extending Noerr to attempts to influence courts and administrative bodies, i.e., 'The right of access to the court is indeed but one aspect of the right of petition.' 404 U.S. at 510, 92 S.Ct. at 611. 'Petitioners, of course, have the right of access to the agencies and courts to be heard on applications sought by competitive highway carriers. That right, as indicated, is part of the right of petition protected by the First Amendment.' Id. at 513, 92 S.Ct. at 613.
 
 
 [22]
 The existence of multiple suits will undoubtedly make it easier to prove that a party did not have the requisite legitimate intent to influence government that is necessary to invoke the first amendment protections of Noerr. We are not, however, concerned here with the ultimate ability of a plaintiff to succeed at trial. Rather, we are concerned with a plaintiff's ability to avoid summary judgment. As to proof at trial, it is entirely conceivable that the requisite sham intent can be proven when there is only a single sham suit
 
 
 [23]
 We recognize that the fraud and bribery mentioned in Trucking Unlimited do not involve the petitioning activity that is the heart of the Noerr-Pennington doctrine. Defendants have not, however, presented any basis for finding this distinction relevant. The Trucking Unlimited Court itself treated the fraud and bribery as analogous to the sham petitioning activity for the purposes of antitrust liability
 
 
 [24]
 In Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977), the Supreme Court was given the opportunity to decide whether the sham exception was applicable in a case in which only a single suit was involved. The Supreme Court, in a three-opinion decision, avoided the question. Vendo involved a federal litigant attempting to enjoin state litigation, on the grounds that the single state suit constituted an antitrust violation. A three-justice plurality opinion refused to enjoin the state suit, holding an injunction was improper under the anti-injunction statute. The two-justice concurring opinion wrote that an injunction was improper because the single suit would not be sufficient to constitute a cause of action under the sham exception. Four dissenters wrote that the suit was not barred by the anti-injunction statute, and that a single claim was enough to constitute a cause of action under the sham exception. The dissent noted, as we noted above, that the Trucking Unlimited Court itself wrote that in certain cases single acts constituted antitrust violations. Moreover, the dissent found no language in Trucking Unlimited which would bar a claim based on a single suit. We are convinced by the dissent
 Lower courts, in cases preceding Vendo Co. v. Lektro-Vend Corp., have split on whether repetitive suits are necessary to have an actionable antitrust violation. Compare Huron Valley Hosp., Inc. v. City of Pontiac, 466 F.Supp. 1301, 1314 (E.D.Mich.1979); MCI Communications Corp. v. American Tel. & Tel. Co., 462 F.Supp. 1072, 1103 (N.D.Ill.1978); Mountain Grove Cemetery Assn. v. Norwalk Vault Co. [1977], 428 F.Supp. 951 (D.Conn.1977); Central Bank of Clayton v. Clayton Bank, 424 F.Supp. 163, 167 (E.D.Mo.1976), aff'd, 553 F.2d 102 (8th Cir.), cert. denied, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977) (all requiring multiple, repetitive suits), with Feminist Women's Health Center v. Mohammad, 586 F.2d 530, 543 n.6 (5th Cir. 1978), cert. denied, sub nom., Palmer v. Feminist Women's Health Center, 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979); Colorado Petroleum Marketers Assn. v. Southland Corp., 476 F.Supp. 373, 377-78 (D.Colo.1979); First Nat'l Bank of Omaha v. Marquette Nat'l Bank [1980], 482 F.Supp. 514 (D.Minn.1979); Technicon Medical Information Systems Corp. v. Green Bay Packaging Inc., [1980] 480 F.Supp. 124 (E.D.Wis.1979); Cyborg Systems, Inc. v. Management Science America, Inc., [1978] Trade Reg.Rep. (CCH) Trade Cas. p61,927, at 73,918 (N.D.Ill.1978); Associated Radio Serv. v. Page Airways, Inc., 414 F.Supp. 1088 (N.D.Tex.1976) (all holding that a single suit is sufficient).
 
 
 [25]
 The commentators agree with this interpretation. See Fischel, Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine, 45 U.Chi.L.Rev. 80, 110 (1977) ('The touchstone of the traditional sham exception--the absence of a genuine intent to influence the government--suggests that although repeated lawsuits are highly probative, they are not necessary to constitute a sham.') (emphasis added); Balmer, Sham Litigation and the Antitrust Laws, 29 Buffalo L.Rev. 39, 55 56 (1980) ('The 'pattern of baseless repetitive claims' language of California Motor Transport will be treated by some as making multiple sham suits a prerequisite for antitrust liability. However, the better analyses will be those which look behind this language to the precedents relied upon in California Motor Transport and which, like Justice Stevens' dissent in Lektro-Vend, view those words as an 'illustration' of an antitrust violation and not a minimum standard. The single sham suit can be a very significant restraint of trade or act in furtherance of monopolization, and it should be prohibited by the Sherman Act. More importantly, . . . the constitutional guarantee of the right of petition which underlies Noerr-Pennington immunity protects only legitimate suits and not sham litigation, whether that litigation consists of one knowingly baseless complaint or many.') Our view that a single sham action is sufficient is not inconsistent with the holding in Ad Visor, Inc. v. Pacific Telephone & Telegraph Co., 640 F.2d 1107 (9th Cir. 1981). In Ad Visor, we stated 'Multiplicity, by itself, does not vitiate the Noerr-Pennington protections.' Id. at 1109
 In support of this view, we relied upon the following language from Justice Blackmun's concurring opinion in Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 97 S.Ct. 2881, 33 L.Ed.2d 1009 (1977): 'Since I believe that federal courts should be hesitant indeed to enjoin ongoing state court proceedings, I am of the opinion that a pattern of baseless, repetitive claims or some equivalent showing of grave abuse of the state courts must exist before an injunction would be proper.' 433 U.S. at 644 (emphasis added).
 Thus, it is not the number of claims which is controlling, but whether the evidence shows that the claim or claims filed constitute an abuse of process. Where the facts are in dispute, this is a question for the trier of fact.
 
 
 [26]
 In the following cases, the Court indicated that sham claims were appropriate, even though access barring was absent. See Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977) (all three opinions assume the filing of baseless lawsuits with the purpose of elimination of competition could constitute an antitrust violation) ('sham litigation in state courts may constitute an antitrust violation') (plurality opinion) Id. at 635 n.6, 97 S.Ct. at 2889 n.6; (pattern of baseless repetitive claims may constitute antitrust violation) (concurring opinion) Id. at 643-44, 97 S.Ct. at 2893-94; ('illegal use of state court litigation as a method of monopolizing or restraining trade is . . . a violation of the antitrust laws') (dissenting opinion) Id. at 653, 97 S.Ct. at 2898; City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 405, 98 S.Ct. 1123, 1132, 55 L.Ed.2d 364 (1978) (anticompetitive litigation in the courts can constitute antitrust violation); New Motor Vehicle Bd. v. Orrin W. Fox Co., 439 U.S. 96, 110 n.15, 99 S.Ct. 403, 412 n.15, 58 L.Ed.2d 361 (1978) ('Dealers who press sham protests before the New Motor Vehicle Board for the sole purpose of delaying the establishment of competing dealerships may be vulnerable to suits under the federal antitrust laws')
 
 
 [27]
 Franchise Realty is very different from the instant case. In Franchise Realty the defendants opposed plaintiffs' applications for building permits. The body which acted on the permits was 'as much a political as an adjudicatory body.' 542 F.2d at 1079. The defendants were successful in their opposition. Here, in contrast, the defendants opposed the plaintiff's applications in a pure adjudicatory body. As the Trucking court noted, activity which is acceptable before a political body is not necessarily acceptable before an administrative or judicial body. See 404 U.S. at 513, 92 S.Ct. at 613. Moreover, in the instant case, the defendants' protests uniformly failed
 
 
 [28]
 The commentators have also agreed with our interpretation
 See R. Bork, The Antitrust Paradox, 354 (1978) ('Certainly, in a proper case, a proved intent not to bar competitors from the courtroom but, by the litigation of baseless claims, to bar them from a market or to delay their entry should suffice for a violation of the Sherman Act'); Areeda & Turner, Antitrust Law p203b at 41 (1978) ('Because the would-be competitors [in Trucking Unlimited] had first to obtain a license from an administrative agency, the Court spoke of defendants' alleged misbehavior as revealing 'a purpose to deprive the competitors of meaningful access to the agencies and courts.' But harassment of rivals through administrative adjudication would seem equally reprehensible and anti-competitive whether or not the actual or potential rival would himself be obliged to seek a license to enter the market in question.')
 
 
 [29]
 The defendants, in a footnote in their brief, also claim that the action for fraud is barred by the statute of limitations. Section 4B of the Clayton Act, 15 U.S.C. Sec. 15b, provides the applicable four-year statute of limitations. Defendants contend that the first fraud claim was asserted in an amended complaint six years after the alleged fraud occurred, and five years after the action was filed, and is accordingly barred by the four-year statute of limitations in the Clayton Act. Even if we assumed the truth of all defendants' allegations, we would not agree with their conclusion that the fraud claim is barred by the statute of limitations
 Rule 15(c) of the Federal Rules of Civil Procedure provides in pertinent part: 'Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.' Under the relation back doctrine of Rule 15(c), the allegations of a new theory in an amended complaint will not be time barred if the theory involves the same transaction, occurrence, or core of operative facts involved in the original claim. See 3 Moore's Federal Practice p15.15, at 15-194 (3d ed. 1980); Wright & Miller, 6 Federal Practice and Procedure Sec. 1496 (1971). In the instant case, the initial complaint alleged antitrust violations involving the defendants' protests to the ICC. The fraud claim in the amended complaint also alleged antitrust violations arising from the protests. The protests involve a single transaction or occurrence. Therefore, the claims involving fraud relate back to the filing of the first complaint, and are not time barred.
 We are mindful that the relation back doctrine of Rule 15(c) is to be liberally applied. Moreover, as recognized by the Fifth Circuit: 'This liberality is particularly persuasive in antitrust suits where there is ample opportunity for discovery and other pretrial procedures.' Woods Exploration & Producing Co., Inc. v. Aluminum Co. of America, 438 F.2d 1286, 1300 (5th Cir. 1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972).
 Here, the initial complaint clearly put defendants on notice that their conduct involving the protests was being challenged in court; the purposes of the statute of limitations were satisfied. In the absence of any evidence of prejudice to defendants caused by the late filing of the fraud claim, there is no reason to find it time barred.
 
 
 [30]
 49 U.S.C. Sec. 15a(3), recodified as 49 U.S.C. Sec. 10704(d), provides:
 In a proceeding involving competition between carriers of different modes of transportation . . . the Commission, in determining whether a rate is lower than a reasonable minimum rate, shall consider the facts and circumstances attending the movement of the traffic by the carrier or carriers to which the rate is applicable. Rates of a carrier shall not be held up to a particular level to protect the traffic of any other mode of transportation, giving due consideration to the objectives of the national transportation policy . . ..
 Section 15a(3) has been held to require the protesting carrier mode to establish that it has the inherent cost advantage. This may be shown by comparing fully allocated costs and establishing that the proposed rate is below protestants' fully allocated costs. See ICC v. New York, New Haven & Hartford R.R. Co., 372 U.S. 744, 83 S.Ct. 1038, 10 L.Ed.2d 108 (1963); American Commercial Lines Inc., v. Louisville & Nashville R.R. Co., 392 U.S. 571, 88 S.Ct. 2105, 20 L.Ed.2d 1289 (1968).
 
 
 [31]
 The Walker Process doctrine is not limited to fraud on the Patent Office. The fact that Walker Process provides a rule of general applicability was intimated in Trucking Unlimited, in which Justice Douglas wrote that '[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process.' 404 U.S. at 513, 92 S.Ct. at 613
 
 
 [32]
 See, e.g., Mt. Hood Stages, Inc. v. Greyhound Corp., 555 F.2d 687, 696 (9th Cir. 1977), vacated and remanded on other grounds, 437 U.S. 322, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978)
 The lengthy [jury] instructions contained two brief passages apparently inspired by Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., . . . and California Motor Transport Co. v. Trucking Unlimited . . .. Greyhound argues that these passages permitted imposition of liability if the jury found no more than that Greyhound had perpetrated a fraud on the Commission or had acted in bad faith in the administrative and related judicial processes, rendering those processes ineffective . . .. At most . . . the only question raised by these passages is whether the doctrine of Walker Process applies outside the patent field.
 When the passages are read in light of the parties' contentions, the evidence in the case, and the instructions as a whole, however, we do not believe they present even this issue. (emphasis added) (citations omitted).
 
 
 [33]
 Defendants also contend that Clipper's claim of fraud is refuted in the record, because the ICC began its investigation into Clipper's Tariff 55 before defendants made their fraudulent representations. Even if this is true, the fraud may have resulted in a longer, more in depth, investigation. We express no opinion here on the ultimate merits of the fraud claim. We are holding here only that a cause of action for fraud is presented--whether it can be proven is not our concern at this point
 
 
 [34]
 We note that in an amicus brief the ICC has urged us to find that deliberate misrepresentations of material facts to the ICC will make out an antitrust claim if other elements of an antitrust claim are present. The ICC states that 'many government agencies the size of the [ICC] have only a small staff to monitor the actions of litigants and must rely on the parties to tell the truth. Thus, a misrepresentation could go undetected unless another party who becomes aware of the wrongdoing comes forward and reports it to public authorities. The incentive provided by treble damage recovery [of antitrust laws] would give parties a monetary inducement to bring to light such wrong-doing.'
 
 
 [35]
 Rather, it is indicative only of the uneasy, but recurring, interplay between patent law, which authorizes monopolies, and antitrust law, which prohibits and punishes monopolies. See Handgards, 601 F.2d at 992 n.10
 
 
 [36]
 In their brief, defendants contend that Clipper's costs in defending against the protests were quite small, and they imply that because they were small, they are noncompensatory. We are not here concerned with the amount of damage. That is a question for the trier of fact. Our sole concern is whether the theory on which damages are claimed is viable
 
 
 [37]
 Defendants also contend that Clipper's damage claim is not compensable because Clipper caused its own injury by deliberately adopting a piecemeal filing strategy before the defendants undertook to protest. It is clear that the only antitrust damages that are recoverable are those which are caused by the defendants' illegal conduct. See Kapp v. Nat'l Football League, 586 F.2d 644, 648 (9th Cir. 1978), cert. denied, 441 U.S. 907, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979). This causation problem, however, is properly determined by the trier of fact. Whether defendants' acts damaged Clipper, and the extent of that damage, is not before us at this time
 The defendants also contend that because RMMTB and not the individual motor carrier defendants filed the protests, only RMMTB could have any liability. The defendants contend that for a member of an association to be liable for an association's acts in violation of antitrust laws the member must have 'knowingly, intentionally and actively participated in an individual capacity in the scheme.' Kline v. Coldwell, Banker & Co., 508 F.2d 226, 232.
 The liability of the individual defendants is not now before this court. Our sole concern at this time is whether a triable cause of action is stated. If so, it will be up to the trier of fact to determine, under the applicable law, which defendants are liable, and the extent of that liability.
 
 
 [38]
 See, e.g., Hughes Tool Co. v. Trans World Airlines, Inc., 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) (when agency (CAB) had power to approve monopolistic practice and did in fact approve the practice, no antitrust action would lie); Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952) (when challenged conference agreement had been approved by U.S. Shipping Board under authority of Shipping Act of 1916, no antitrust action based on challenge to conference agreement would lie). See also United States Navigation Co. v. Cunard S.S. Co., 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932); Pan American World Airways, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963)
 See Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) (ICC vested with pervasive rate setting power; court cannot intervene if it would upset rate structure); Georgia v. Penn. R.R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945) (ICC has pervasive power over rate setting; court interference would result in unjust discrimination contrary to Congressional intent; Court noted that ICA does not provide remedies for the correction of all of the abuses of rate-making which might constitute violations of antitrust laws.