529 F.Supp.2d 1139 (2007)
UNITED STATES of America, ex rel. Karen CERICOLA, Relator,
v.
FEDERAL NATIONAL MORTGAGE ASSOC, a/k/a Fannie Mae, Envoy Capital Corp., and Arthur Aldridge, Defendants.
No. CV 03-2294 GAF (VBKx).
United States District Court, C.D. California.
December 28, 2007.
*1140 *1141 Arthur R. Loevy, Jonathan I. Loevy, Mike Kanovitz, Loevy & Loevy, Chicago, IL, Brian P. McCafferty, Katherine B. Bornstein, Provost & Umphrey, Philadelphia, PA, Mark Allen Kleiman, Mark A. Kleiman. Law Offices, Santa Monica, CA, Frank D. Kortum, Assistant U.S. Attorney LA, Office of U.S. Attorney, Los Angeles, CA, Dee Lord, Dodge Wells, Joyce R. Branda, U.S. Department of Justice, Washington, DC, for Relator.
Aaron Gregory Murphy, Daniel R. Seltzer, David J. Schindler, Terri Lea Lilley, Latham & Watkins, Los Angeles, CA, for Defendants.
MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION TO DISMISS FOURTH AMENDED COMPLAINT OR, IN THE ALTERNATIVE, MOTION TO STRIKE PORTIONS OF THE FOURTH AMENDED COMPLAINT
GARY ALLEN FEESS, District Judge.

I.

INTRODUCTION
This is the second of two motions to dismiss brought by Defendant Federal National Mortgage Association ("Fannie Mae"). On November 27, 2007, the Court denied Fannie Mae's motion to dismiss the Fourth Amended Complaint ("FAC") for lack of subject matter jurisdiction. In the present motion, Fannie Mae moves to dismiss the FAC for failure to plead fraud with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. Fannie Mae contends that the only specific allegations in the FAC relate to fraudulent Title I loans that another entityBen Franklin Banksubmitted to the government, which were settled in a prior federal action. Accordingly, Fannie Mae contends that the FAC fails to plead specific allegations *1142 for any fraudulent loans it submitted to the government, which are, by Plaintiffs own account, the subject of the present action. Moreover, Fannie Mae asserts that any claims against it for the period preceding January 2000 are time-barred by the six-year FCA statute of limitations. In the alternative, Fannie Mae moves to strike portions of the FAC relating to the Title I loans already settled in the prior federal action.
For the reasons set forth in greater detail below, the Court concludes that the FAC contains no specific allegations regarding the "thousands" of fraudulent Title I loans that Fannie Mae allegedly submitted to the government, which Plaintiff expressly states are the subject of the present action. Because Plaintiff has failed to plead her FCA claims against Fannie Mae with the requisite level of particularity, the Court DISMISSES the FAC. Given the liberal standard for permitting a party to amend her pleadings, the Court GRANTS Plaintiff LEAVE TO AMEND the FAC, although, having now reviewed and considered the issues presented in this motion, the Court has become deeply skeptical that Plaintiff can meet the Rule 9 standard because she appears to have nothing more than a belief that Fannie Mae engaged in misconduct.
With respect to the statute of limitations argument, the Court DENIES the motion to dismiss claims that arose prior to January 12, 2000 because the dismissal motion conflates the "relation back" standard with the Rule 9(b) standard. Although the Third Amended Complaint falls far short of meeting the Rule 9(b) pleading standard, an amended pleading "relates back" to a claim or defense that "arose out of the conduct, transaction, or occurrence set outor attempted to be set outin the original pleading." Fed.R.Civ.P. 15(c)(1)(B) (emphasis added). Here, Plaintiff has plainly attempted to set out a claim regarding Fannie Mae's submission of claims for federal insurance on non-qualifying Title I loans. The Court therefore rejects Fannie Mae's assertion that the Third Amended Complaint contains allegations so vague that there is' no conduct, transaction, or occurrence to relate back to.
Finally, because the Court dismisses the FAC, Fannie Mae's motion to strike is DENIED as MOOT.

II.

BACKGROUND
While the Court has already addressed some of the relevant background in Fannie Mae's first motion to dismiss, the Court finds that revisiting, and further expanding on, this background is needed to properly address the present motion. A summary of the relevant procedural history is therefore provided below.
Plaintiff Karen Cericola is a former employee of Ben Franklin Bank of Illinois ("BFB"), which invested in Title I loans by purchasing them from other lenders and selling them to entities like Fannie Mae. (Fourth Amended Complaint ("FAC") ¶ 7.) .In an action filed in the District Court for the Northern District of Illinois ("Cericola I"), Plaintiff originally brought FCA claims against BFB for selling non-qualifying Title I mortgage loans to Fannie Mae and others. (See FAC ¶ 9.) In relevant part, Plaintiff claimed that BFB had defrauded Fannie Mae by concealing and failing to disclose that the Title I loans being sold to Fannie Mae had not been properly underwritten and were at risk of default.[1] (See Cericola I Docket, Ex. 13 *1143 [Second Amended Complaint] ¶¶ 79-82.) Plaintiff eventually settled Cericola I with BFB in early 2004. (Id., Ex. 117 [3/11/04 Stipulated Order of Dismissal];)
Meanwhile, Plaintiffs claims against other lenders were transferred to this Court. Plaintiff filed a Third Amended. Complaint ("TAC") in this Court, and for the first time brought FCA claims against Fannie Mae, which Plaintiff had previously characterized as a victim of BFB's fraudulent practices. The TAC was filed on May 14, 2003 and was kept under seal while the U.S. Government continued to investigate the matter. On September 14, 2005, the Government filed a notice of declination, and on September 16, 2005, this Court issued an order lifting the seal on the TAC. Plaintiff decided to simplify her claims in a proposed FAC, which alleged claims against only Fannie Mae, Envoy, and Aldridge. (See 2/8/06 Order at 2.) On February 8, 2006, the Court granted Plaintiff leave to file the FAC, which was deemed filed on that date. (See id. at 3.)
In the FAC, Plaintiff alleges, in relevant part, that between 1995 and 1998, Fannie Mae acquired Title I loans under its "HomeStyle" mortgage purchase program. (FAC ¶ 2.) Under this program, Fannie Mae, purchased thousands of loans from other lenders and obtained warranties that these loans qualified for Title I insurance. (Id.) Fannie Mae then repackaged most of these loans and sold them as federally-insured mortgage-backed securities. (Id.) However, approximately 70% of the loans Fannie Mae purchased under the HomeStyle program were ineligible for HUD insurance because of improper underwriting, servicing, and/or the fact that the originating lenders, from whom Fannie Mae purchased these loans, had made loans to unqualified borrowers. (Id. ¶¶ 2, 69.) These loans often suffered from allegedly obvious defects, such as forged 2 forms or fictitious co-signers, which Fannie Mae would have easily discovered had it conducted proper due diligence. (Id. ¶ 3.) Fannie Mae did not review these loan files until after a borrower defaulted, at which time it would typically undertake a file review, identify defects in the origination of the loan, and demand that the originating lender repurchase the loan under the terms of its contract with. Fannie Mae. (Id. ¶ 4.) Due to the sheer volume of ineligible loans generated under Fannie Mae's HomeStyle program, however, many originating lenders refused to repurchase the defective loans despite the apparent contractual warranties and repurchase commitment given to Fannie Mae when it acquired the loans. (See id.)
The FAC asserts that, commencing in 1998 when large numbers of originating lenders defaulted on their repurchase obligations, Fannie Mae sought to mitigate its own losses by knowingly submitting these defective Title I mortgage loans to the U.S. Government to obtain HUD insurance proceeds. (See id. ¶¶ 4, 82.) While Fannie Mae contends that it was not responsible for the submission of ineligible claims to HUD, Plaintiff alleges that Fannie Mae in feet controlled the claims submission process for each Title I loan in its portfolio. (Id. ¶¶ 83-84.)
Moreover, Plaintiff expressly states that the FCA claims against Fannie Mae in the present action are not related to the 81 allegedly fraudulent Title I mortgage loans that BFB settled in Cericola I. Paragraph 9 of the FAC provides:
Mrs. Cericola has already obtained a recovery on behalf of the United States for [BFB]'s portfolio of ineligible loans, most of which it sold to Fannie Mae, in the case of United States ex rel. Karen Cericola v. Ben Franklin Bank, 99-C-6311 (N.D.Ill.). She does not seek a further recovery from Fannie Mae for the loans [it] bought from [BFB] in this *1144 case. Instead, this case concerns thousands of other loans on which Fannie Mae submitted false insurance claims to HUD.

(Emphasis added.) Thus, in the present action, Plaintiff alleges FCA claims against Fannie Mae for "thousands" of other fraudulent and ineligible Title I mortgage loans that Fannie Mae knowingly submitted to HUD. (Id. ¶¶ 6, 9.)
Paragraph 79 of the FAC describes 78, ineligible loans that Fannie Mae allegedly submitted to HUD for insurance. (See FAC ¶ 79.) However, these 78 loans are identical to 78 loans that Plaintiff previously claimed BFB submitted to HUD for insurance, and which Plaintiff settled with BFB in Cericola I. (Compare FAC ¶ 79 with Cericola I Docket, Ex. 63 [Cericola I Third Amended Complaint ("TAC")], Exs. C-D [Charts].)[2] The three loans described in Paragraph 80 of the FAC, which were not sold to Fannie Mae, are also identical to three loans that Plaintiff previously claimed BFB submitted to HUD for insurance, and for which Plaintiff settled with BFB in Cericola I. (Compare FAC ¶ 80 with Cericola I Docket, Ex. 63 [Cericola I TAC] at exhibit pages 403-04.) These 81 loans-78 Fannie Mae loans and three non-Fannie Mae loansare the only loans described in any detail in the FAC.

III.

DISCUSSION
A. MOTION TO DISMISS
1. PLEADING FRAUD UNDER RULE 9(B)
a. The Legal Standard
Rule 9(b) provides that in all averments of fraud or mistake, the circumstances constituting fraud or mistake must be stated with particularity. See Fed. R.Civ.P. 9(b). Complaints brought under the FCA must fulfill the requirements of Rule 9(b). Bly-Magee v. California, 236 F.3d 1014, 1018 (9th Cir.2001).
While "Rule 9(b) may not require [a qui tam plaintiff] to allege; in detail, all facts supporting each and every instance" of a defendant's false claim(s), the complaint must, at a minimum, be specific enough "to give [a] defendant[ ] notice of the particular misconduct which is alleged to constitute the fraud charged so that [it] can defend against the charge and not just deny that [it has] done anything wrong." United States ex rel. Lee v. SmithKline Beecham Inc., 245 F.3d 1048, 1051-52 (9th Cir.2001) (citations omitted). "Such a requirement is wholly consistent with the purpose of the FCA." Bly-Magee, 236 F.3d at 1019 (citing Wang v. FMC Corp., 975 F.2d 1412, 1419 (9th Cir.1992)). Indeed, such a requirement should easily be met in qui tam actions because insiders who are privy to fraud, which is the group that the statute encourages to bring these FCA lawsuits, "should have adequate knowledge of the wrongdoing at issue." Id. (citation omitted). The Rule 9(b) obligation of stating the "who, what, when and where" of the alleged fraud should therefore present less of a barrier in qui tam actions than might exist in other kinds of fraud cases. See Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir.1997) (finding complaint pleaded with the requisite particularity because it identified the "who (eight of [defendant's] customers), what (four types of improper revenue recognition), when (last two quarters of 1993 and first quarter of 1994), and where (reported in financial statements)" of the alleged fraud) *1145 (emphasis added); United States v. Sequel Contractors, Inc., et al, 402 F.Supp.2d 1142, 1152 (C.D.Cal.2005) ("In the Ninth Circuit, Rule 9(b) requires allegations of fraud to `state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation'") (quoting Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir.1986)); Odom v. Microsoft Corp., 486 F.3d 541, 553 (9th Cir.2007) (same); Herndon v. Science Applications Int'l Corp., 2007 WL 2019653, at *2 (S.D.Cal. July 10, 2007) ("As the FCA is an anti-fraud statute, an action brought under the FCA must fulfill the particularity requirements of Rule 9(b). [Citations omitted.]").
In her Opposition, Plaintiff erroneously argues that she need not meet these obligations and that pleading a "general fraudulent scheme" is sufficient to satisfy Rule 9(b)'s pleading requirements. (See Opp. at 27.) Her contention flies in the face of controlling case law, discussed above, that requires FCA allegations be specific enough to give a defendant notice of the particular misconduct alleged, Bly-Magee, 236 F.3d at 1019, which generally requires allegations of the who, what, where, and when of that alleged misconduct. See Cooper, 137 F.3d at 627; SmithKline, 245 F.3d at 1051. Thus, Plaintiff does not even identify the proper standard governing the resolution of the present motion.
b. Analysis
As noted above, by Plaintiffs own account, the 81 loans previously settled in Cericola Iand described at, length in Paragraphs 79 and 80 of the FACare not encompassed in the present lawsuit. "Instead, this case concerns thousands of other loans on which Fannie Mae submitted false insurance claims to HUD." (FAC ¶ 9 (emphasis added).)
Having considered the allegations against Fannie Mae with respect to the "thousands" of other loans it allegedly submitted to the government for HUD insurance, the Court concludes that the FAC is devoid of the requisite particularity required under the Rule 9(b) pleading standard. The FAC alleges only a vague scheme to submit false claims to HUD to obtain insurance reimbursement for nonqualifying loans. For example, Plaintiff alleges that between the years 1995 to 1998, Fannie Mae ran its "HomeStyle" mortgage loan purchase program for Title I loans. (FAC ¶ 2.) Because of improper underwriting, servicing, and other problems, approximately 70% of these loans were ineligible for HUD insurance. (Id.) Fannie Mae caused the submission of claims for HUD insurance on loans it knew were ineligible under the Title I program. (Id. ¶ 6.) Plaintiff then devotes several pages to an overview of the. Title I program in general. (Id. ¶¶ 16-58.) Plaintiff then describes how Fannie Mae, as a leader in the Title I market, amassed a portfolio of ineligible loans. (Id. ¶ 59-69.) Within this section, the only specific allegation is that, based upon Plaintiffs experience with Title I loans, approximately 70% of the loans originated in the 1995-98 period were ineligible for Title I insurance, and Fannie Mae purchased approximately 28,000 Title I loans during that period. (Id. § 69.)
Plaintiff does allege that she "first encountered" Fannie Mae's repurchase strategy in 1998 when BFB began receiving repurchase demands from Fannie Mae. (Id. ¶ 77.) Plaintiff alleges that beginning in 1998, Fannie Mae required its servicer or subservicer to follow a uniform claims procedure that Fannie Mae had specifically created for Title I loans. (Id. ¶ 85.) The first step in the claims procedure was to fill out a Fannie Mae claim approval form and forward it to the Fannie Mae *1146 regional office. (Id. ¶ 86.) Upon default on a loan, Fannie Mae's underwriting center would review the file and identify any bases for ineligibility. A Fannie Mae regional office would then demand the participating lender repurchase the loan. If the lender refused, the regional office would make a preliminary decision of whether to submit an insurance claim to HUD. That decision would be referred to Fannie Mae's credit loss review committee; if they concurred, then Fannie Mae would instruct the servicer or subservicer to submit an insurance claim to HUD. (Id. ¶ 87.) Plaintiff further alleges that for each claim covered by this suit, Fannie Mae reviewed that file and demanded the participating lender repurchase the loan, but apparently failed, thereby sending those claims to HUD to collect insurance. (See id. ¶ 90.)
While Plaintiff describes a general scheme to defraud the government, explained above, aside from the 81 previously settled loans, that are expressly excluded from this lawsuit (see FAC ¶¶ 9, 79-80), there is absolutely no mention of any actual loans, or any specific description of types of loans, allegedly submitted to the government. These allegations amount to an assertion that, because Fannie Mae participated in the relevant market and the pertinent governmental program, it must have been engaged in fraudulent activity. This is not enough to require an answer.
Plaintiff's allegations of a generally fraudulent scheme are similar to the plaintiffs allegations in SmithKline, where that plaintiff alleged that defendant had knowingly changed lab results and submitted worthless tests to obtain government benefits. See SmithKline, 245 F.3d at 1051. As articulated by the Ninth Circuit, such a "broad claim had no factual supportLee did not specify the types of tests implicated in the alleged fraud, identify the SmithKline employees who performed the tests, or provide any dates, times, or places the tests were conducted." Id. (emphasis added.) The Circuit then noted that although "Rule 9(b) may not require Lee to allege, in detail, all facts supporting each and every instance of false testing over a multi-year period." the FAC was "not specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." Id. at 1051-52 (citation omitted). The same holds true here. Without having any factual support as to the types of loans, the relevant time period, employees involved, and the like, Fannie Mae does not have adequate notice of the particular misconduct it is alleged to have committed. This is particularly true, as noted above, because it was a large player in the Title I market, and, by Plaintiffs own estimation, had "purchased approximately 28,000 Title I loans during [the relevant time period from 1995 to 1998]." (FAC ¶ 69.)
The FAC and the arguments made in opposition to this motion suggest that Plaintiff has a belief that Fannie Mae engaged in fraudulent conduct but has no information sufficient to meet the Rule 9 pleading standard. She instead alleges a general fraud scheme, in the hope that she can develop actual evidence of fraud through the discovery process. That approach is not sanctioned under either the FCA or the pleading requirements set forth in the Federal Rules of Civil Procedure. United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 231 (1st Cir.2004). Plaintiff must do more if this case is to proceed forward.
Since the FAC fails to satisfy the pleading requirements of controlling case law, the Court GRANTS Fannie Mae's motion and orders the FAC DISMISSED.
*1147 2. LEAVE TO AMEND
a. The Legal Standard
Leave to amend a pleading is generally freely granted, and is within the discretion of this Court. See Fed.R.Civ.P. 15(a); Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir.1987) (citation omitted). Moreover, leave to amend should be granted unless the district court "`determines that the pleading could not possibly be cured by the allegation of other facts.'" SmithKline, 245 F.3d at 1052 (quoting Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir.2000)). However, the liberality in granting leave to amend is subject to the qualification that the amendment does not prejudice the opposing party, does not create undue delay, is not sought in bad faith, and does not constitute an exercise in futility. DCD Programs, 833 F.2d at 186 (citations omitted); Forsyth v. Humana, Inc., 114 F.3d 1467, 1482 (9th Cir.1997) (citations omitted).
b. Analysis
Given the liberality in permitting amendment, e.g., Foman, 371 U.S. at 182, 83 S.Ct. 227, the Court GRANTS Plaintiff leave to amend the FAC because she may be able to allege additional facts to satisfy the level of particularity required under Rule 9(b). The Court notes, however, that the lack of specificity in her existing allegations against Fannie Mae in either the TAC or FAC strongly hints at her lack of actual knowledge of any false claims submitted by Fannie Mae. See Bly-Magee, 236 F.3d at 1019 ("Because `insiders privy to a fraud on the government' should have adequate knowledge of the wrongdoing at issue, such insiders should be able to comply with Rule 9(b)") (citation omitted).
3. FCA STATUTE OF LIMITATIONS AND RELATION BACK
Title 31 U.S.C. § 3731 sets forth two statutes of limitations for the FCA. First, it gives a plaintiff six years from the time a "violation" is committed to bring suit. See 31 U.S.C. § 3731(b)(1).[3] Alternatively, if the fraud is concealed, a plaintiff must bring an action within three years after the facts material to the right of action are known or reasonably should have been known to the official charged with acting on the violation, subject to a ten-year statute of repose. See id. § 3731(b)(2).
Here, Fannie Mae focuses on the six-year statute of limitations set forth in Section 3731(b)(1), contending that any false claims asserted against it for the period preceding January 12, 2000 must be dismissed with prejudice as being time-barred. Fannie Mae arrives at this date because it was served with a copy of Plaintiffs proposed FAC on January 12, 2006. (Mot. at 25.)[4]
*1148 Given the FAC's lack of particularity regarding Fannie "Mae's alleged false claims, see Section III.A.1.b., above, it is difficult to determine when Fannie Mae allegedly submitted false claims to HUD. Nevertheless, for purposes of relation back analysis, the Court will assume that there are specific pre-2000 FCA violations that Plaintiff can plead, should she be permitted leave to amend. In her Opposition, Plaintiff does not dispute that any pre-January 12, 2000 FCA claims are time-barred unless they relate back to the TAC which was filed, under seal, in 2003. (See Opp. at 30-33.)
a. The Legal Standard for the Relation Back Doctrine
Rule 15(c)(1)(B) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set outor attempted to be set outin the original pleading. . . ." (Emphasis added.)
If the applicable statute of limitations has run and a party seeks to amend a claim, "[t]he court is to determine whether the amendment is transactionally related to the original pleading." Martell v. Trilogy Ltd., 872 F.2d 322, 324 (9th Cir.1989). The court should "analyze[ the two pleadings to determine whether they share a common core of operative facts sufficient to impart fair notice of the transaction, occurrence, or conduct called into question." Id. at 327. The relation back standard is more leniently applied when a plaintiff seeks only to amend a claim against an existing defendant, as opposed to adding an entirely new defendant. See id. at 324.
b. Analysis
Defendant offers three reasons why' he relation back doctrine does not apply. First, Defendant argues that there are no operative facts in the TAC to even "relate back" to. Second, Defendant asserts that the FCA requires qui tam plaintiffs to disclose substantially all material evidence in their possession. By Plaintiffs own account, she uncovered Fannie Mae's fraudulent activity in 1998, but did not name Fannie Mae as a defendant in this action until 2003 when she filed her then-under seal TAC. Accordingly, Defendant argues that Plaintiff should not be permitted to benefit from the relation back doctrine because it would not effectuate the purposes of the FCA and qui tam actions. Defendant's third argument is a broader one, and takes issue with FCA qui tam complaints in general. Defendant contends that because FCA qui tam complaints are filed, and kept, under seal while the Government investigates the claims made therein, a defendant does not have adequate notice of the claims against it. Essentially, Defendant contends that filing an FCA complaint under seal is fundamentally incompatible with the relation back doctrine, and cites a recent Second Circuit case, United States v. The Baylor Univ. Med. Ctr., 469 F.3d 263, 269-71 (2d Cir. 2006), in support of this proposition. (See Mot. at 26-27.)
As discussed in greater detail below, the Court rejects these arguments. First, while the FAC fails to meet the Rule 9 standard applicable to fraud claims, the fundamental nature of the claim is nonetheless apparent from the pleading. As Rule 15 states, the amended complaint need only arise out of conduct "attempted to be set out" in the earlier pleading. Nothing in the rule suggests that a pleading *1149 failure negates the relation back doctrine and allows claims to be extinguished through the operation of the Statute, of limitations. With respect to the last, two arguments regarding the purposes of FCA and qui tam actions, the Court finds nothing in the FCA legislation that precludes application of the relation back doctrine to qui tam complaints. The Second Circuit decision cited by Defendant focuses on governmental conductspecifically the government's delay in determining whether to interveneand holds only that the government's complaint-in-intervention does not relate back to the transaction alleged in the original qui tam complaint. Accordingly, the Court rejects Defendant's contention that claims from the period preceding January 12, 2000 should be deemed time-barred.
i. The TAC
Defendant contends that the TAC contains no description of any specific facts or transactions that would provide a basis for application of the relation back doctrine. However, as articulated by Martell, which reversed a district court's determination that the relation back doctrine did not apply, this Court must determine whether the amended complaint shares sufficient commonality to the original complaint "to impart fair notice of the transaction, occurrence, or conduct called into question." 872 F.2d at 327. In articulating a liberal view of the relation back doctrine, and a consequent narrow application of the statute of limitations where an amended pleading is presented, the Martell court wrote:
Limitation is suspended by the filing of a suit because the suit warns the defendant to collect and preserve his evidence in reference to it. When a suit is filed in a federal court under the Rules, the defendant knows that the whole transaction described in it will be fully sifted, by amendment if need be, and that the form of the action or the relief prayed or the law relied on will not be confined to their first statement.
Id. at 326 (citations omitted); see also Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240, 1259 n. 29 (9th Cir.1982) (antitrust violations arising out of defendants' protest to Interstate Commerce Commission (ICC) treated as single transaction encompassing all complaints made by defendants to the ICC even though not referenced in original complaint).
Here, though it does not present an appropriate level of detail under Rule 9, the TAC nevertheless articulates the outlines of a scheme to defraud that put Fannie Mae on notice of the nature of its alleged wrongdoing:
 "In the late 1990s," Fannie Mae became aware that many of the Title I loans it purchased in the secondary market did not qualify for HUD insurance. (TAC ¶ 19.) Fannie Mae decided to submit these claims to the government for HUD insurance. (Id.)
 Fannie Mae purchased its Title I loans "with recourse," meaning that Fannie Mae obtained warranties that these loans were in accordance with Title I underwriting and other guidelines, and that Fannie Mae could demand repurchase for these loans if their warranties were breached. (Id. ¶ 20.)
 Fannie Mae had a national policy where after a Title I loan defaulted, Fannie Mae would, first try to get the seller to repurchase the loan. If the lender refused, Fannie Mae would not write off the loan as a loss. (Id. ¶ 22.)
 Instead, it was Fannie Mae's "national policy" of attempting to have HUD pay insurance on the ineligible loan in order to mitigate its own losses. (Id. ¶¶ 9, 23.) Only if HUD refused to pay insurance *1150 would Fannie Mae then write off the loan as a loss. (Id. ¶ 23.)
 Fannie Mae would "cause[ ] the creation of false or fraudulent insurance claims documents including Forms HUD-637 and HUD-27030 to get false claims paid for ineligible loans." (Id. ¶ 34.)
 Accordingly, Plaintiff alleges that "at all times relevant hereto," Fannie Mae "submitted insurance claims to HUD which it knew were ineligible as evidenced by its prior demand that the selling lender repurchase the ineligible loan." (Id. ¶ 24.)
In the Court's view, the foregoing allegations "impart fair notice" of the nature of the alleged fraudulent conduct in which Fannie Mae engaged and adequately warned it "to collect and preserve [its] evidence in reference to it." See Martell, 872 F.2d at 326.
ii. Fannie Mae's Other Arguments
Fannie Mae also argues that because the FCA requires a qui tam plaintiff to come forward with a "written disclosure of substantially all material evidence and information" she possesses, 31 U.S.C. § 3730(b)(2), Plaintiff should not be permitted to use the relation back doctrine to link her FAC to her placeholder TAC. In support, Defendant cites a First Circuit case, United States ex rel. Karvelas v. MelroseWakefield Hosp., 360 F.3d 220, 231 (1st Cir.2004), where that Circuit noted that courts are reluctant to permit qui tam relators to "use discovery to meet the requirements of Rule 9(b)" while they have "suffered no injury in fact" and instead may "file suit as a pretext to uncover unknown wrongs." (Internal quotation marks and citations omitted.) In United States ex rel. Hyatt v. Northrop Corp., moreover, the Ninth Circuit noted that "[o]nce the qui tam plaintiff has the requisite information, he cannot sleep on his rights. He is `charged with responsibility to act under the circumstances." 91 F.3d 1211, 1217 (9th Cir.1996).
At the outset, the Court notes again that this argument tends to conflate the Rule 9 obligation with the requirements of Rule 15. The Court can find no case that holds that the failure to meet the Rule 9 obligation precludes application of the relation back doctrine. Moreover, the argument tends to focus on issues pertaining to the application of the FCA statute of limitations set forth in 31 U.S.C. § 3731(b)(2), which provides that a civil FCA action may not be brought more than three years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances. Whether the statute of limitations might apply in this case cannot be decided on the record now before this Court, and it does not provide for denying application of the relation back doctrine. See Hyatt, 91 F.3d at 1217.
Fannie Mae also argues that because FCA complaints are filed under seal while the Government investigates the claims made therein, FCA complaints are fundamentally incompatible with the relation back doctrine because they do not impart fair notice upon the defendant Again, no case so holds and' the case relied on by Fannie Mae, United States v. The Baylor Univ. Med. Ctr., 469 F.3d 263, 269-71 (2d Cir.2006), appears to be an outlier case and, in any event, is distinguishable because it focused on the application of the doctrine to the Government's complaint-in-intervention. The Second Circuit concluded that the application of the statute of limitations to the Government's complaint-in-intervention runs from the date that it files its complaint, and does not relate back to the qui tam relator's filing. Id. at *1151 268. See also United States ex rel. Parikh v. Premra Blue Cross, CV 01-0476 MJP, 2007 WL 1031724, at *4 (W.D.Wash.Apr.3, 2007) ("Baylor does not stand for the proposition that the limitations period is toiled on the date the case is unsealed, and there is substantial case law to the contrary"); United States ex rel. Costa v. Baker & Taylor, Inc., 1998 WL 230979, at *3 (N.D.Cal. Mar.20, 1998) (rejecting defendant's argument for permitting tolling and relation back only when a complaint is unsealed, by noting that Congress did not differentiate between sealed and unsealed complaints). Accordingly, Baylor is not controlling in the present circumstances.
B. MOTION TO STRIKE
Because the Court grants Fannie Mae's motion to dismiss the FAC, the Court DENIES Fannie Mae's motion to strike portions of the FAC as MOOT.

IV.

CONCLUSION
For the foregoing reasons, the Court finds that Plaintiff has failed to plead her FCA claims against Fannie Mae with the requisite level of particularity required by Rule 9(b), and accordingly DISMISSES the FAC. The Court GRANTS Plaintiff LEAVE TO AMEND her claims. The Court concludes that it cannot rule, through application of the relation back doctrine, that any FCA claims against Fannie Mae relating to the period preceding January 12, 2000 are time-barred.
IT IS SO ORDERED.
NOTES
[1] Plaintiff and Fannie Mae filed a joint stipulation submitting the majority of documents filed in Cericola I with this Court ("Cericola I Docket"), and this Court took judicial notice of these documents on May 1, 2007.
[2] The Court concludes that the loans listed in the Cericola I TAC are the same loans listed in the present action's FAC because for each of the loans: (1) the last names of the debtors match; (2) the amount of the loans match; (3) the originating lenders match; and (4) Plaintiff never contends otherwise.
[3] A "violation" is committed at the time a party submits a false claim to the government. See United States ex rel. Aflatooni v. Kitsap Physicians Sem, 314 F.3d 995, 1002 (9th Cir. 2002) (noting that, in order to establish a violation of the FCA, a party "must show an actual false claim for payment being made to the Government" and that "[e]vidence of an actual false claim is the sine qua non of a False Claims Act violation") (emphasis added) (internal quotation marks and citations omitted).
[4] Although the FAC was not filed until February 8, 2006, the parties do not dispute that January 12, 2006 is the operative date for when Plaintiff brought the then-proposed FAC for purposes of determining the applicable FCA statute of limitations. (See Mot. at 24; Opp. at 33-34; see also United States ex rel. Costa v. Baker & Taylor, Inc., 1998 WL 230979, at *3 (N.D.Cal. Mar. 20, 1998) (noting that the FCA statute of limitations "speaks in terms of when an action is `brought.' It gives plaintiffs six years from the time a violation occurs to bring suit.") (emphasis added).) Accordingly, the Court agrees that the operative date for when Plaintiff "brought" the FAC is January 12, 2006, not February 8, 2006.